UNITED STATES of America, Appellee,

v.

Eugene BOFFA, Sr., Robert Boffa, Sr., Louis S. Kalmar, Sr., and Chandler Lemon, Appellants.

Nos. 81–2660 to 81–2666.

United States Court of Appeals, Third Circuit.

Argued May 25, 1982.

Decided Aug. 25, 1982.

---

Ronald G. Cole, U. S. Dept. of Justice, Philadelphia Strike Force, Philadelphia, Pa., Joseph J. Farnan, Jr., U. S. Atty., Dist. of Del., Wilmington, Del., Kenneth F. Noto, William C. Bryson, Frank J. Marine (argued), Attys., Dept. of Justice, Washington, D. C., for appellee.

Seymour Margulies (argued), Maurice Brigadier, Robert E. Margulies, Margulies & Margulies, P. A., Jersey City, N. J., for Eugene Boffa, Sr.

Ronald F. Kidd (argued), Michael M. Mustokoff, Philip N. O'Reilly, Duane, Morris & Hecksher, Philadelphia, Pa., for Robert Boffa, Sr.

Thomas C. Carroll (argued), John R. Carroll, Carroll & Carroll, Philadelphia, Pa., for Louis Kalmar, Sr.

Thomas A. Bergstrom (argued), Philadelphia, Pa., for Chandler Lemon.

Before SEITZ, Chief Judge, and SLOVITER and BECKER, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

Eugene Boffa, Sr., Robert Boffa, Sr., Louis Kalmar, Sr., and Chandler Lemon appeal from judgments imposing sentences of imprisonment, fines, and forfeitures entered after their convictions of racketeering offenses. 18 U.S.C. § 1962(c) & (d) (1976). Eugene Boffa, Sr. and Lemon also appeal from judgments imposing sentences of imprisonment entered after their convictions of mail fraud. 18 U.S.C. § 1341 (1976). This court has jurisdiction under 28 U.S.C. § 1291 (1976).

### I.

Appellants were tried before a jury on an eleven-count indictment, which also names as co-defendants Francis Sheeran, David Mishler, and Robert Rispo.[1] Count I charges appellants with conspiring to violate the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. § 1962(d). Count II alleges that appellants violated the substantive provisions of RICO, 18 U.S.C. § 1962(c). Counts V through XI charge appellants Eugene Boffa, Sr. and Chandler Lemon with violating the mail fraud statute, 18 U.S.C. § 1341.[2]

Before describing the factual allegations in the indictment, we will briefly outline the statutory scheme of RICO as it relates to this case. Section 1962(c) of the Act provides:

[1] Before trial, Rispo entered a plea of guilty to Count I pursuant to a plea agreement with the Government. Mishler's case was severed from this action, and was ultimately dismissed. Sheeran was tried separately and convicted. He has filed a separate appeal.

[2] Counts III and IV of the indictment relate only to defendant Sheeran and thus are not involved in this appeal.

It shall be unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

Section 1962(d) makes it unlawful for any person to conspire to violate section 1962(c).

The term "enterprise" includes not only legal entities such as partnerships, corporations, and associations, but also any group of individuals "associated in fact." 18 U.S.C. § 1961(4). Section 1961 of RICO enumerates the racketeering activities, or "predicate acts," that are necessary to establish a RICO offense. These predicate acts include violations of 18 U.S.C. § 1341 (mail fraud), 29 U.S.C. § 186 (Taft-Hartley Act), and 18 U.S.C. § 1503 (obstruction of justice). To establish a "pattern" of racketeering activity, the Government must prove that at least two of these acts occurred within a ten-year period. 18 U.S.C. § 1961(5).

The indictment in this case is a complex document. It alleges sixty-two racketeering acts based on violations of three federal statutes, involving different combinations of appellants who were engaged in various transactions. The common strand running through the indictment is appellants' association with the enterprise, comprising "a group of individuals associated in fact for the purpose of making money and obtaining other financial benefits through the business of labor leasing and motor vehicle leasing." The enterprise was operated through nine separate corporations engaged in the labor leasing business and one corporation in the business of leasing motor vehicles. The indictment alleges that Eugene Boffa, Sr., along with one or more of the other appellants, "would control and participate in the operation" of all ten corporations.

The predicate acts alleged in the indictment include violations of the mail fraud statute, the Taft-Hartley Act, and 18 U.S.C. § 1503 (obstruction of justice). We will summarize the factual allegations contained in the indictment as they relate to each predicate offense.

### A. *Mail Fraud*

The indictment charges Eugene Boffa, Sr. and Chandler Lemon with ten violations of the mail fraud statute in connection with a "labor switch" at the Inland Container Corporation's facility at Newark, Delaware. In essence, the indictment alleges that appellants switched the labor leasing contracts at Inland from one corporation they controlled to another that was ostensibly independent, but which in fact they also controlled. By providing benefits to the official of the union that represented employees of the first corporation, the enterprise obtained his cooperation in the scheme. The indictment alleges that, as a result of the switch, employees were deprived of 1) the loyal, faithful, and honest services of the union official; 2) economic benefits they enjoyed through rights guaranteed them by the National Labor Relations Act (NLRA), 29 U.S.C. § 157; and 3) economic benefits they enjoyed through rights they had under an existing collective bargaining agreement.

The indictment describes the scheme in some detail. Between 1971 and 1977, Universal Coordinators, Inc. (UCI), a New Jersey Corporation controlled by Eugene Boffa, Sr. leased truck drivers to Inland's Newark facility. These drivers were represented by the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Teamsters) Local 326, headed by co-defendant Francis Sheeran. Concerned about recurring labor disputes at the Inland plant, appellant Eugene Boffa, Sr. and Sheeran agreed that after the election of officers of Local 326 in November, 1976, Boffa would terminate the leasing contract between UCI and Inland and substitute for UCI a second leasing company controlled by the enterprise. The purpose of the switch was to "cause the employees of UCI . . . to be fired and not rehired by the second leasing company."

In furtherance of this scheme, Eugene Boffa, Sr. and Chandler Lemon incorporated Preferred Personnel of Miami, Florida,

and Boffa terminated UCI's leasing contract with Inland. Shortly thereafter, Lemon contacted Inland on behalf of Preferred Personnel, and offered to provide drivers following the expiration of the UCI contract. Lemon stated that neither he nor the company were in any way associated with Eugene Boffa, Sr. or UCI. He offered to provide drivers represented by the Brotherhood of Railway and Airline Clerks, who he claimed would demand substantially lower wages and fringe benefits than the Teamsters. After Inland accepted Lemon's offer, Preferred Personnel supplied an entirely new group of drivers, and the UCI employees who had been working at Inland lost their jobs. The mails were used to effectuate the scheme when appellants caused termination notices to be sent to UCI drivers. The Inland Container labor switch also formed the basis for Counts V through XI of the indictment, which allege substantive violations of the mail fraud statute.

The indictment charges appellant Robert Boffa, Sr. with nine mail fraud violations in connection with a similar labor switch at the Van Wert, Ohio facility of Continental Can Corporation. From at least 1967 until 1975, UCI leased truck drivers, who were represented by Teamsters Local 908, to Continental Can. In 1975, Continental Can expressed dissatisfaction with the service provided by UCI, and UCI agreed to provide better service if its fees were increased by 25%. When Continental Can refused, Robert Boffa, Sr., acting through UCI, decided to terminate the contract and provide drivers to Continental through Country Wide Personnel of Chicago (CWP), which he controlled as well. The alleged purpose of this switch was to enable CWP to obtain higher fees from Continental Can than had been paid to UCI, while paying less to Teamsters Local 908 drivers.

Robert Boffa, Sr. directed co-defendants Mishler and Rispo to meet with the drivers at the Continental Plant and inform them that they would be losing their jobs with UCI because of the contract termination. On behalf of CWP, Mishler and Rispo offered to hire the UCI drivers, but at lower wage rates. Both men denied that there was any relationship between CWP and UCI. The scheme was completed when UCI sent termination notices to each of the drivers. After CWP had negotiated a contract with Continental Can, the former UCI employees, now employed by CWP, continued to work at the Van Wert, Ohio facility, but at lower wage and mileage rates than they had been paid by UCI. The mailing of the termination notices in furtherance of the scheme formed the basis for the mail fraud allegations. As a result of this scheme, the indictment alleges that UCI employees at Continental Can were deprived of 1) economic benefits they enjoyed through rights guaranteed by the NLRA; and 2) economic benefits they enjoyed under the collective bargaining agreement between UCI and Local 908.

### B. Taft-Hartley

The indictment alleges that on four occasions, Eugene Boffa, Sr. and appellant Louis Kalmar, Sr., co-owners of UCI, "did cause UCI to deliver the free use for a month ... of a 1975 Lincoln Continental ... to Francis Sheeran ... with intent to influence [Sheeran] in respect to his actions and duties as president of [Teamsters] Local 326, all in violation of [29 U.S.C. § 186(a)(4) & (d)]." Further, the indictment charges that Boffa and Kalmar, through All Purpose Leasing Inc., agreed to sell Sheeran the automobile at a price below its market value, also in an attempt to influence Sheeran in violation of § 186(a)(4) & (d).

### C. Obstruction of Justice

The indictment charges that Eugene Boffa, Sr. knowingly turned over false and fictitious records of All Purpose Leasing, Inc. (APL) to the grand jury investigating the automobile transactions between APL and Sheeran, in violation of 18 U.S.C. § 1503.

### D. The Jury Verdict

The jury, which recorded its findings as to each predicate act on a summary verdict sheet, convicted all four appellants of the conspiracy and substantive RICO counts. Eugene Boffa's RICO convictions were

based on the following predicate acts: ten mail fraud violations in connection with the labor switch at Inland Container, five Taft-Hartley violations arising out of the lease and sale arrangement with Sheeran, and one violation of 18 U.S.C. § 1503. Chandler Lemon's RICO convictions were based on ten mail fraud violations, also in connection with the Inland switch. Five mail fraud violations in connection with the labor switch at Continental Can supported Robert Boffa's RICO convictions, and four Taft-Hartley violations in connection with the automobile lease arrangement with Sheeran supported Louis Kalmar's RICO convictions. The jury found that appellants owned at least part of the various corporations listed in the indictment, and thus that these interests were subject to forfeiture pursuant to 18 U.S.C. § 1963(a). After the jury verdict, the district court sentenced appellants to terms of imprisonment ranging from eight to 20 years, imposed fines of up to $47,000, and ordered that appellants forfeit to the United States their interests in the corporations associated with the enterprise.[3]

## II.

Appellants Eugene Boffa, Sr., Robert Boffa, Sr., and Chandler Lemon contend that the labor switches at the Inland Container and Continental Can plants were, at most, unfair labor practices prohibited by section 8 of the NLRA, 29 U.S.C. § 158 (1976), and therefore not properly the subject of a mail fraud prosecution. In essence, they assert that the "schemes to defraud" alleged in the indictment simply do not constitute crimes under 18 U.S.C. § 1341.

We begin with the mail fraud statute, which provides criminal penalties for devising "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. Since the Supreme Court recog-

nized that a "scheme or artifice to defraud" is not limited to the common law of fraud and false pretenses, *Durland v. United States*, 161 U.S. 306, 313–14, 16 S.Ct. 508, 511, 40 L.Ed. 709 (1896), courts have struggled to define the contours of the mail fraud statute. Generally, it has been expansively construed to prohibit all schemes to defraud by any means of misrepresentation that in some way involve the use of the postal system. *United States v. Pearlstein*, 576 F.2d 531, 534 (3d Cir. 1978).

In accordance with the statutory policy of preventing the use of the mails to further such fraudulent schemes, most courts have rejected the argument that 18 U.S.C. § 1341 was intended to prohibit only schemes to defraud individuals of money or property. *See, e.g., United States v. States*, 488 F.2d 761, 763–64 (8th Cir. 1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974); *United States v. Lewis*, 514 F.Supp. 169, 172–77 (M.D.Pa.1981). Relying on the broad purposes of the statute, these courts have held that the mail fraud statute prohibits schemes to defraud individuals of "intangible" interests or rights as well. *But cf.* Comment, *The Intangible-Rights Doctrine and Political-Corruption Prosecutions under the Mail Fraud Statute*, 47 U.Chi.L.Rev. 526, 566 (1980) (legislative history of 18 U.S.C. § 1341 "indicate[s] that the statute only reaches schemes that have as their goal the transfer of something of economic value to defendant").

Thus, courts have sanctioned mail fraud prosecutions based on deprivations of a variety of intangible rights. *See United States v. Bronston*, 658 F.2d 920, 927 (2d Cir. 1981) (client's right to "undivided loyalty" of attorney); *United States v. Von Barta*, 635 F.2d 999 (2d Cir. 1980), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981) (employer's right to the honest and faithful service of employees); *United States v. Bohonus*, 628 F.2d 1167 (9th Cir.), *cert. denied*, 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980) (same); *United States*

---

**3.** In addition to the RICO counts, the jury convicted Eugene Boffa, Sr. and Chandler Lemon of seven counts of mail fraud. The jury found that Eugene Boffa, Sr. had not committed the four predicate acts in connection with another labor switch that he allegedly engineered at the Crown Zellerbach Corporation's plant at Newark, Delaware.

*v. Condolon,* 600 F.2d 7 (4th Cir. 1979) ("time, effort and expectations"); *United States v. Louderman,* 576 F.2d 1383 (7th Cir.), *cert. denied,* 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978) (privacy rights); *States,* 488 F.2d at 765 ("certain intangible political rights"); *Shushan v. United States,* 117 F.2d 110 (5th Cir.), *cert. denied,* 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531 (1941) (public's right to a public official's honest, faithful, and disinterested services); *United States v. Fineman,* 434 F.Supp. 189, 195 (E.D.Pa.1977) (same). In perhaps the broadest statement of the reach of 18 U.S.C. § 1341, the United States Court of Appeals for the Fourth Circuit observed that the mail fraud statute proscribes any scheme "that is contrary to public policy and conflicts with accepted standards of moral uprightness, fundamental honesty, fair play, and right dealing." *United States v. Mandel,* 591 F.2d 1347, 1361 (4th Cir.), *conviction aff'd in relevant part,* 602 F.2d 653 (1979) (in banc), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980); *See also United States v. Serlin,* 538 F.2d 737 (7th Cir. 1976).

█ Although we have not had occasion either to accept or reject the "intangible interest or right" theory of mail fraud, we find the reasoning employed by these courts persuasive, and thus recognize that a scheme to deprive persons of intangible rights or interests may be within the ambit of 18 U.S.C. § 1341. We do not believe that mail fraud prosecutions based on this theory are boundless, however, and we may not extend the reach of 18 U.S.C. § 1341 beyond the limits envisioned by Congress. Unfortunately, ascertaining those limits is no easy task; the legislative history of the mail fraud statute, which was first enacted in 1872, is of little assistance in determining whether Congress intended the statute to reach schemes to deprive individuals of a particular "intangible" right. *See Von Barta,* 635 F.2d at 1005.

█ We are not, however, entirely without congressional guidance. When construing a statute, courts generally may not accord great weight to expressions of intent by subsequent Congresses. *See Consumer Product Safety Commission v. GTE Sylvania,* 447 U.S. 102, 117, 100 S.Ct. 2051, 2060, 64 L.Ed.2d 766 (1980). Nonetheless, the Supreme Court has recognized that such an examination may, in some cases, help define vague enactments. *Labor Board v. Drivers Union,* 362 U.S. 274, 291–92, 80 S.Ct. 706, 715–16, 4 L.Ed.2d 710 (1960) ("Courts may properly take into account the later Act when asked to extend the reach of the earlier Act's vague language to the limits which, if read literally, the words might permit."). *See NLRB v. Allis-Chalmers Mfg. Co.,* 388 U.S. 175, 194, 87 S.Ct. 2001, 2013, 18 L.Ed.2d 1123 (1967); *In re Perisco,* 522 F.2d 41, 64–65 (2d Cir. 1975). We believe that an examination of the language and the legislative history of a federal statute is necessary to determine whether it can serve as the source of an intangible right in a mail fraud prosecution. *See United States v. DeLaurentis,* 491 F.2d 208, 212 (2d Cir. 1974); *United States v. Johnson,* 390 U.S. 563, 564–66, 88 S.Ct. 1231, 1232–33, 20 L.Ed.2d 132 (1968) (examining legislative history of the Civil Rights Act of 1964, 42 U.S.C. § 2000a, to determine whether prosecution for conspiracy to deprive individuals of rights guaranteed by that Act was permissible under federal civil rights conspiracy statute, 18 U.S.C. § 241 (1976)). As a matter of statutory construction, we are unwilling to sanction mail fraud prosecutions for schemes to deprive individuals of a particular intangible right when such a prosecution would contravene the intent of the Congress that created that right. *Cf. Great American S & L Association v. Novotny,* 442 U.S. 366, 372–76, 99 S.Ct. 2345, 2349–51, 60 L.Ed.2d 957 (1979) (civil rights action under 42 U.S.C. § 1985(3) based on deprivations of rights guaranteed by Civil Rights Act of 1964 impermissible where such action would undermine policies of Title VII of that Act).

With these principles in mind, we proceed to examine the indictment's allegations relating to mail fraud.

### A.

█ The indictment alleges that, in connection with the labor switches at Inland

Container and Continental Can, appellants deprived employees of:

Economic benefits they enjoyed through rights guaranteed them under the National Labor Relations Act, [29 U.S.C. § 157], to self-organization, to form, join and assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining and other mutual aid and protection.

The premise of appellants' argument is that this portion of the indictment alleges a deprivation of "intangible rights" guaranteed by section 7 of the NLRA. From this, they contend that, in enacting the NLRA, Congress did not intend that violations of employees' section 7 rights could serve as the basis for a mail fraud prosecution.

The Government vigorously disputes appellants' characterization of the indictment. It contends that appellants' mail fraud violations did not rest on the commission of unfair labor practices. Instead, the Government asserts that the indictment alleges schemes to deprive employees of *economic interests* obtained through rights guaranteed them by the NLRA. Because, in the Government's view, the "scheme or artifice" involved a deprivation of employees' property interests, it falls squarely within the traditional scope of the mail fraud statute.

We believe that appellants' characterization of the scheme alleged in the indictment is more accurate. Reduced to its essence, the indictment alleges that the scheme deprived employees not of tangible property or money, but of their interest in rights guaranteed by the NLRA. That the Government has couched its allegations in terms of "economic benefits" does not alter our conclusion. We believe it is neither analytically helpful nor practically possible to distinguish the "economic benefits" of rights guaranteed by the NLRA from the rights themselves. To be sure, the rights guaranteed by section 7 are of economic value to employees covered by the NLRA. However, we cannot conclude that, as a

consequence, statutory rights are transformed into analytically distinct "economic benefits." The source of those "economic benefits" lies exclusively in the statute, and appellants could deprive employees of those benefits only by committing one or more unfair labor practices.

Our conclusion as to the nature of the indictment crystallizes the issue before us. We must determine whether a scheme to deprive employees of rights guaranteed by section 7 of the NLRA is within the ambit of the mail fraud statute. This determination requires an examination of the congressional policies underlying the NLRA. We find two such policies particularly pertinent: the remedial nature of the Act and the primacy of the National Labor Relations Board in resolving unfair labor practice disputes.

1.

The National Industrial Recovery Act, Pub.L.No.73–67, 48 Stat. 195, 197–98 (1933), from which the rights enumerated in section 7 derive, authorized the Justice Department to institute criminal prosecutions against employers who refused to take corrective measures after violating employees' statutory rights. *See* Rep.No. 972, 74th Cong. 1st Sess. 2 (1935). The first draft of the NLRA introduced in the House of Representatives made the commission of certain unfair labor practices a misdemeanor punishable by a $500 fine. H.R. 8423, 74th Cong., 1st Sess. (1934), *reprinted in* Legislative History of the National Labor Relations Act of 1935 1128, 1131 (1949). In the final version of the Wagner Act, however, Congress provided no such criminal penalties for unfair labor practices. Instead, section 10(c) of the NLRA provides that upon finding that a party has committed an unfair labor practice, the National Labor Relations Board (NLRB) "shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay." 29 U.S.C. § 160(c) The House Report envisioned the "affirmative action" as remedial

in nature, to "effectuate the policies of the bill; i.e. as defined in section 1, to encourage the practice of collective bargaining and to protect the exercise by the worker of [his rights under the Act]." H.Rep.No. 972, at 21.

The Supreme Court has emphasized the remedial rather than punitive nature of the Act. In *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940), the Court held that an order of the NLRB penalized the employer for committing an unfair labor practice, and was therefore impermissible. The Court observed:

The Act is essentially remedial. It does not carry a penal program declaring the described unfair labor practices to be crimes. The Act does not prescribe penalties of fines in vindication of public right ... Had Congress been intent upon such a program, we cannot doubt that Congress would have expressed its intent and would itself have defined its retributive scheme.

*Id.* at 10, 61 S.Ct. at 79. The Court stated that the Act's remedial measures "relate to the protection of the employees and the redress of their grievances, not to the redress of any supposed public injury after the employees have been made secure in their right of collective bargaining and have been made whole." *Id.* at 11, 61 S.Ct. at 79. *See Edison Co. v. NLRB*, 305 U.S. 197, 236, 59 S.Ct. 206, 220, 83 L.Ed. 126 (1938) ("The power to command affirmative action is remedial, not punitive.").

Although we are not confronted with a punitive order of the NLRB, the principles articulated in *Republic Steel* are highly relevant. They do not merely represent limitations upon the Board's power to issue certain types of orders, but rather reflect the general policy relating to the remedial nature of the Act. This policy, which we regard as an important aspect of the overall statutory scheme, suggests that Congress did not intend to create new criminal sanctions when it endowed employees with section 7 rights.

Debates on the Taft-Hartley amendments to the NLRA in 1947 highlight Congress's intent that violations of the civil provisions of the Act were to be without criminal consequences. In response to a question on the Senate floor, Senator Taft explained that the term "unlawful" in section 303(a) of the Taft-Hartley Act, 29 U.S.C. § 187(a), did not mean that labor organizations could be prosecuted for conspiring to violate that provision under the federal conspiracy statute, 18 U.S.C. § 88 (1940):

Mr. Pepper: ... Was it the desire of the Senator from Ohio to make those acts unlawful?

Mr. Taft: That is correct. I may say that the definition is exactly the same as we had of an unfair labor practice. The effect of making it unlawful is simply that a suit for damages can be brought ... There is no criminal penalty of any kind ...

. . . . .

Mr. Baldwin: As I understand, what we are considering would be unlawful in the sense only that it would create a civil liability for damages. It is not unlawful in the sense that there would be any criminal liability?

Mr. Taft: It is unlawful. There may be other results arising from it, but there would not be a criminal penalty in my opinion, because there is no criminal penalty prescribed in the amendment.

93 Cong.Rec. 5060–61 (May 9, 1947), *reprinted in* Legislative History of the Labor Management Relations Act of 1947 1371–73 (1974). Similarly, the absence of any criminal sanctions in section 8 of the NLRA suggests that Congress did not contemplate that employers would be subject to criminal liability, even by operation of another statute, as a result of committing an unfair labor practice.

To permit mail fraud prosecutions grounded on unfair labor practices would be to impose criminal penalties for conduct that, until now, has been remediable solely under the NLRA. Indeed, we are aware of only two cases in which the Government attempted to use sections 7 and 8 of the NLRA as the basis for a criminal prosecution. In *United States v. DeLaurentis*, the

United States Court of Appeals for the Second Circuit held that the right of employees to refrain from joining in concerted activities guaranteed by section 7 of the NLRA cannot form the basis of a criminal prosecution under 18 U.S.C. § 241.[4] *See United States v. Bailes*, 120 F.Supp. 614 (S.D.W.Va.1954) (also rejecting § 241 prosecution based on unfair labor practice). Observing that the legislative history of the NLRA "clearly indicates that criminal penalties were not intended for violations of the National Labor Relations Act," 491 F.2d at 212, the court declined to permit the "huge expansion of federal criminal liability of employers and union officials envisioned by the Government." *Id.* at 214. We share the *DeLaurentis* court's reluctance to sanction, for the first time, a criminal prosecution based on an unfair labor practice, and agree that "[t]he care and compromise that went into [sections 7 and 8] suggest that Congress would not silently import sweeping criminal liability into the regulation of labor relations." *Id.*

2.

Another congressional policy underlying the NLRA is pertinent in ascertaining the reach of the mail fraud statute: the exclusive authority of the NLRB to decide whether conduct of employers or employees constitutes an unfair labor practice. The Supreme Court has consistently emphasized the primacy of the NLRB in resolving unfair labor practice disputes. *See National Licorice Co. v. NLRB*, 309 U.S. 350, 365, 60 S.Ct. 569, 577, 84 L.Ed. 799 (1940) (NLRA "commits to the Board the exclusive power to decide whether unfair labor practices have been committed and to determine the action the employer must take to remove or avoid the consequences of his unfair labor practices"). This principle serves the important statutory policy of insuring that a uniform federal labor law is developed by an administrative agency with special expertise in that area. *See Motor Coach Em-*

*ployees v. Lockridge*, 403 U.S. 274, 296, 91 S.Ct. 1909, 1922, 29 L.Ed.2d 473 (1971); *Garner v. Teamsters Union*, 346 U.S. 485, 490–91, 74 S.Ct. 161, 165–66, 98 L.Ed. 228 (1953). We believe the "overriding interest in a uniform, nationwide interpretation of the federal statute by the centralized expert agency created by Congress," *New York Telephone Co. v. New York Labor Department*, 440 U.S. 519, 528, 99 S.Ct. 1328, 1334, 59 L.Ed.2d 553 (1979), casts serious doubt on the proposition that Congress intended schemes to defraud employees of section 7 rights to fall within the ambit of the mail fraud statute.

Under this portion of the indictment, the district court and jury were required to address precisely the type of purely statutory questions that Congress intended only the Board to resolve: whether the object of appellants' scheme constitutes an unfair labor practice. For example, in charging the jury, the district court explained what, in its view, would constitute an unfair labor practice:

An employer violates his duty to bargain collectively and deprives his employees of that right if he unilaterally modifies or terminates a term or terms of a collective bargaining agreement relating to wages, hours of work, or other terms and conditions of employment without first (1) serving written notice upon the other party to the contract of the proposed termination or modification at least sixty days prior to the proposed termination or modification; (2) offering to meet and confer with the other party for the purpose of negotiating a new contract containing the proposed modifications; (3) notifying the Federal Mediation and Conciliation Service and any comparable state or local agencies within thirty days after notification of the existence of the dispute; and (4) continuing the present contract in full force for at least sixty days after the required notification.

---

**4.** 18 U.S.C. § 241 provides, in relevant part:

If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution

or laws of the United States, or because of his having exercised the same:

. . . .

They shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

Similarly, if an employer is replaced by a second employer which is an alter ego of the first, and the alter ego at that time subsequently modifies or terminates a term of the collective bargaining agreement relating to wages, hours, or other conditions of employment without following the required procedures, the Section 157 rights of the affected employees are violated and those employees have been deprived of property for the purposes of the Mail Fraud Statute.

As this instruction makes clear, the judge and the jury were engaged in balancing the interests of employers and employees, a task that Congress entrusted exclusively to the NLRB. As the *DeLaurentis* court observed, "whether or not a 'right' exists under § 7 of the Labor Act and whether or not that right has been violated are frequently complex questions of law—hardly issues that are best resolved by a jury in a criminal trial." 491 F.2d at 213. We believe that Congress did not envision that the mail fraud statute would serve as an exception to its policy of insuring a uniform interpretation of the NLRA by an administrative agency with special expertise in the labor area.

Because we perceive a sufficiently strong indication that Congress did not intend unfair labor practices to have any criminal consequences, we hold that a scheme to deprive employees of section 7 rights does not constitute a crime under the mail fraud statute.

### B.

■ The indictment alleges that appellants deprived employees of the "[e]conomic benefits they enjoyed through rights they had under the collective bargaining agreement." We believe that a scheme to defraud employees of these economic benefits, such as wages and seniority rights, lies squarely within the ambit of the mail fraud statute. The source of such benefits was the contract between the appellants and the employees. Although they may have been obtained as a result of employees' exercise of rights guaranteed by section 7 of the

NLRA, these benefits are contractual, not statutory, in nature. While deprivation of section 7 may be vindicated solely through the procedures established for unfair labor practice disputes, we believe the broad language of the mail fraud statute proscribes schemes to deprive an individual of economic benefits that are contained in a collective bargaining agreement. *See United States v. McNeive*, 536 F.2d 1245, 1248–49 (8th Cir. 1976) ("There can be little doubt that . . . schemes are within the scope of § 1341 [when] they involve calculated efforts to use misrepresentation or other deceptive practices to induce the innocent or unwary to give up some tangible property interest.").

### C.

The indictment also alleges that Eugene Boffa, Sr. and Chandler Lemon deprived employees at the Inland Container plant of "[t]he loyal, faithful, and honest services of defendant FRANCIS SHEERAN in the performance of his duties as the elected and salaried president of [Teamsters] Local 326." A number of courts have sustained mail fraud convictions based on schemes to deprive individuals of similar rights. *See Von Barta*, 635 F.2d at 1005 (employer's right to loyal and honest services of employees); *United States v. Diggs*, 613 F.2d 988, 998 n.54 (D.C.Cir.1979), *cert. denied*, 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980) (public's right to loyal and honest services of public officials).

■ There is little doubt that union officials owe union members a fiduciary duty. Section 501(a) of the Labor Management Disclosure Act of 1959 (LMDRA), 29 U.S.C. § 501(a) declares that union officials "occupy positions of trust in relation to such organization and its members as a group" and provides that "it is the duty of each such person . . . to refrain from dealing with such organizations as an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization. . . ." This section imposes fiduciary responsibility in

its broadest sense, and is not confined to financial dealings by union officials. *See Sabolsky v. Budzanoski*, 457 F.2d 1245, 1250–52 (3d Cir.), *cert. denied*, 409 U.S. 853, 93 S.Ct. 65, 34 L.Ed.2d 94 (1972). We believe that the LMDRA established, as a matter of federal law, union members' right to the honest and faithful services of union officials.

■ Assuming, without deciding, that the LMDRA is the sole source of such a right, we perceive nothing in its legislative history to suggest that Congress intended this intangible right to be outside the ambit of the mail fraud statute. Unlike sections 7 and 8 of the NLRA, with their clearly remedial purpose and carefully structured administrative scheme, section 501(a) merely establishes a standard of duty for union officials, and permits union members to bring actions against officials for breach of that duty. This remedy was clearly not intended to be exclusive. *See* 29 U.S.C. § 413 (nothing in this title "shall limit the rights and remedies of any member of a labor organization under any State or Federal law or before any other court or tribunal"); Cox, *Labor Law Preemption Revisited*, 85 Harv.L.Rev. 1337, 1372 (1972) ("Congress has never developed a comprehensive and impliedly exclusive plan of federal regulation for union-member relations."). In fact, the statute provides no remedies or sanctions whatsoever against employers or other third parties who cause union officials to breach their fiduciary duties. In short, there is no indication that prosecutions for schemes to defraud employees of the intangible right provided in 29 U.S.C. § 501 would contravene any congressional policy. *See United States v. Stout*, 499 F.Supp. 602 (E.D.Pa.1980) (LMDRA does not preclude mail fraud prosecution for union official's scheme to defraud his labor union). We therefore believe that a scheme to defraud employees of the loyal, faithful, and honest services of their union official alleges a crime within the scope of the mail fraud statute.

### III.

■ Appellants Eugene Boffa, Sr., Robert Boffa, Sr., and Chandler Lemon next advance a distinct, but not entirely unrelated contention. They suggest that because the mail fraud allegations pertain to activities that at least arguably constitute unfair labor practices, even those portions of the indictment that state crimes under 18 U.S.C. § 1341 must be dismissed under the doctrine of primary jurisdiction of the NLRB. Assuming, without deciding, that appellants' conduct is at least arguably prohibited by section 8 of the NLRA[5], we decline to accept the proposition that the NLRA precludes the enforcement of a federal statute that independently proscribes that conduct as well.

In *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), the Supreme Court established the parameters of the doctrine of primary jurisdiction of the NLRB: "When an activity is arguably subject to § 7 or § 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Garmon*, and all subsequent decisions that have refined the doctrine of primary jurisdiction, have involved attempts by states to regulate "arguably protected" or "arguably prohibited" activity. In such cases, the "governing consideration is that to allow states to control activities that are potentially subject to federal regulation involves too great a danger of conflict with federal labor policy." *Garmon*, 359 U.S. at 246, 79 S.Ct. at 780. *See Farmers v. Carpenters*, 430 U.S. 290, 301 n.10, 97 S.Ct. 1056, 1064 n.10, 51 L.Ed.2d 338 (1977); *Air Transport Association of America v. Professional Air Traffic*

5. Although we of course express no opinion as to the outcome of an unfair labor practice charge involving appellants' conduct, we note that this court has held that a "corporate shell game" designed to avoid an employer's obligation to bargain collectively constitutes a violation of § 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5). *NLRB v. Scott Printing Corp.*, 612 F.2d 783 (3d Cir. 1979).

*Controllers Organization,* 667 F.2d 316, 323 (2d Cir. 1981). The Supreme Court has not considered the question now before us: whether the doctrine of primary jurisdiction operates to "displace" a federal criminal statute that independently prohibits conduct that is also arguably prohibited by the NLRA.

Appellants argue that the principle of primary NLRB jurisdiction as developed by *Garmon* and its progeny is not limited to concurrent state regulation of conduct that is arguably prohibited by the NLRA. Because the congressional policy favoring the regulation of labor disputes by the NLRB may be undermined as much by conflicting federal regulation as by concurrent state regulation, appellants suggest that the doctrine must preclude a mail fraud prosecution involving activity that is arguably prohibited by the NLRA. Although this position has a superficial appeal, a close examination of the policies underlying the doctrine of primary jurisdiction reveals its flaws.

■■■ First, the doctrine of primary NLRB jurisdiction is of constitutional dimension; it is grounded, at least in part, upon considerations of federal supremacy. *See Garmon,* 359 U.S. at 244, 79 S.Ct. at 779 ("To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and regulation imposed by State law."). No such constitutional concerns are implicated when a federal criminal statute is said to impinge upon the primary jurisdiction of the NLRB.

Second, it is a judicially created doctrine, born out of the Supreme Court's "ongoing efforts to decipher the presumed intent of Congress." *Sears, Roebuck, & Co. v. Carpenters,* 436 U.S. 180, 188 n. 12, 98 S.Ct. 1745, 1753 n.12, 56 L.Ed.2d 209 (1978). *See Lockridge,* 403 U.S. at 286, 91 S.Ct. at 1917. Accordingly, in determining whether state regulation of "arguably prohibited" conduct must yield to the NLRA, courts must ascertain the extent to which Congress intended such conduct to be regulated by

federal, and not state law. When conduct is regulated both by the NLRA and another federal statute, the focus is not on the federal-state balance envisioned by Congress. Rather, the question becomes whether, by enacting the NLRA, Congress intended to work an implied repeal of existing federal criminal statutes insofar as they regulate "arguably prohibited" conduct. *See United States v. Burnett,* 505 F.2d 815, 816 (9th Cir. 1974) (per curiam), *cert. denied sub nom. Lyon v. United States,* 420 U.S. 966, 95 S.Ct. 1361, 43 L.Ed.2d 445 (1975) ("To assume . . . that the mere passage of a specific statute covering an area of conduct also regulated by a more general statute limits enforcement of the general statute . . . is, in effect, to accomplish a partial repeal of the general statute.").

■■ The Supreme Court has repeatedly emphasized the strong judicial policy against implied repeals. *E.g. Posadas v. National City Bank,* 296 U.S. 497, 504–05, 56 S.Ct. 349, 352–53, 80 L.Ed. 351 (1936). A new statute will not be read as partially repealing a prior statute unless a "positive repugnancy" exists between the two. *Blanchette v. Connecticut General Insurance Corp.,* 419 U.S. 102, 134, 95 S.Ct. 335, 354, 42 L.Ed.2d 320 (1974). The Court has cautioned that "[i]n the absence of some affirmative showing of intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Morton v. Mancari,* 417 U.S. 535, 550, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974). Moreover, to constitute an implied repeal, the later-enacted statute must cover the entire field occupied by the earlier one. *United States v. Tynen,* 78 U.S. (11 Wall.) 88, 92, 20 L.Ed. 153 (1870).

Appellants point to no evidence that Congress intended to repeal federal statutes that regulate criminal conduct in the labor field, nor have we discovered such an intent. If the legislative history of the NLRA points in any direction, it suggests that Congress did not intend the NLRA to displace either state or federal laws relating to fraud or violence. *See* S.Rep.No. 573,

74th Cong., 1st Sess. 17 (1935) ("the procedure set up in this bill is not nearly so well suited as is existing law to the prevention of . . . fraud and violence [by unions or union members]"). *See United States v. Thordarson*, 646 F.2d 1323, 1331 (9th Cir.), *cert. denied*, 454 U.S. 1055, 102 S.Ct. 601, 70 L.Ed.2d 591 (1981) ("Nothing in the language or legislative history suggests that federal criminal statutes . . . should not . . . be available to punish union members and officials who try to achieve collective bargaining goals by reason of . . . violence."). Nor can it be said that the two statutes are in irreconcilable conflict. That the mail fraud statute makes criminal activity that may also be proscribed by the NLRA does not render the former statute "positively repugnant" to the latter.

Moreover, the overlap between the two statutes is rather circumscribed. In *United States v. Brien*, 617 F.2d 299 (1st Cir. 1979), *cert. denied*, 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980), the court rejected the contention that section 2(a)(1) of the Commodities Futures Trading Act (CFTA), 7 U.S.C. § 2(a)(1), which provides that the Commodities Futures Trading Commission "shall have exclusive jurisdiction" over transactions subject to regulation by the Commission, precluded a prosecution under the mail fraud statute. Applying the principle announced in *Tynen*, the court observed that the "CFTA, which prohibits only interstate communications in commodities fraud, obviously does not cover the entire ground occupied by 18 U.S.C. § 1341 . . . which appl[ies] to mail . . . communications in furtherance of *any* scheme to defraud." *Id.* at 310. Although some "schemes to defraud" may also constitute unfair labor practices, the overlap between the NLRA and the mail fraud statute is similarly limited. The latter statute prohibits the use of the mails in furtherance of any fraudulent scheme, whereas the relevant provisions of section 8 of the NLRA proscribe conduct that interferes with the exercise of employees' statutory rights.

We thus conclude that the "arguably prohibited" nature of appellants' conduct cannot exempt them from prosecution under

the mail fraud statute. *Cf. Silkwood v. Kerr-McGee Corp.*, 637 F.2d 743, 736 (10th Cir. 1980), *cert. denied*, 102 S.Ct. 132 (1981) (federal interest in protecting citizens from conspiracies to violate civil rights statutes sufficient to permit action under 42 U.S.C. § 1985(3) involving "arguably prohibited" conduct); *but cf., Iowa Beef Processors, Inc. v. Gorman*, 476 F.Supp. 1382 (N.D.Iowa 1979) (union members' counterclaim under § 1985(3) preempted by NLRA where complaint, in substance, alleged only unfair labor practice).

### IV.

We now consider the effect of our conclusions upon the convictions of Eugene Boffa, Sr. and Chandler Lemon under the mail fraud counts (V through XI) of the indictment, and upon the conspiracy and substantive RICO convictions of each of the four appellants under counts I and II of the indictment.

#### A. *Mail Fraud*

 We have concluded that, apart from the allegation relating to the deprivation of section 7 rights, counts V through XI of the indictment allege crimes under the mail fraud statute. Because the jury may have relied on the section 7 allegations in convicting Eugene Boffa, Sr. and Chandler Lemon of seven counts of mail fraud, however, we must reverse those convictions and remand for a new trial on the proper portions of counts V through XI. *See United States v. Kavazanjian*, 623 F.2d 730, 739 (1st Cir. 1980); *United States v. Dansker*, 537 F.2d 40, 51 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

#### B. *RICO*

Each appellant was convicted on the conspiracy and substantive RICO counts of the indictment. The RICO convictions of Robert Boffa, Sr. and Chandler Lemon were based exclusively upon predicate acts of mail fraud. Because the jury may have impermissibly relied on the section 7 allegations in concluding that they violated the

mail fraud statute, we will reverse their RICO convictions and remand for a new trial on the proper portions of counts I and II.

The RICO convictions of Eugene Boffa, Sr. and Louis Kalmar, Sr. are unaffected by our conclusion as to the mail fraud predicate acts. In addition to the mail fraud predicates, Eugene Boffa, Sr.'s RICO convictions are supported by five violations of 29 U.S.C. § 186(a) (Taft-Hartley) and one violation of 18 U.S.C. § 1503 (obstruction of justice). Kalmar's RICO convictions are grounded exclusively upon violations of 29 U.S.C. § 186(a).

## V.

Because the RICO convictions of appellants Louis Kalmar, Sr. and Eugene Boffa, Sr. are supported by the requisite number of predicate acts even after dismissal of the mail fraud counts based on alleged section seven violations, we proceed to examine the additional grounds they contend require reversal.

The jury found that Boffa and Kalmar committed four violations of 29 U.S.C. § 186(a), which makes it "unlawful for any employer or association of employers . . . to . . . deliver . . . any money or other thing of value to any officer or employee of a labor organization with intent to influence him in any respect to any of his actions. . . ." The indictment charges:

EUGENE BOFFA, SR., and LOUIS KALMAR, SR. unlawfully, willfully and knowingly did cause UCI to deliver the free use for a month, as specified below, of a 1975 Lincoln Continental . . . to Francis Sheeran by paying the monthly lease payment for this vehicle to APL [All Purpose Leasing] with intent to influence Francis Sheeran in respect to his actions, decision and duties as President of IBT Local 326; all in violation of [29 U.S.C. § 186(a)(4) & (d)].

The indictment lists seven racketeering acts, representing the dates on which APL received UCI's monthly payment, and the month of free use attributable to each payment. The jury found that appellants had committed four Taft-Hartley violations between July and October, 1975.

## A.

Appellants do not contend that they did not violate Taft-Hartley; rather, they urge that under the facts of this case, they could have violated it only once. In considering this argument we enter the often metaphysical realm of multiplicity—the charging of a single statutory offense in different counts of an indictment. Recognizing the danger posed by "the simple expedient of dividing a single crime into a series of temporal or spatial units," *Brown v. Ohio*, 432 U.S. 161, 169, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), the Supreme Court has cautioned that units of prosecution are determined by reference to the applicable statute. *United States v. C. I. T. Corp.*, 344 U.S. 218, 73 S.Ct. 227, 97 L.Ed. 260 (1952). The operative language of 29 U.S.C. § 186(a) in this respect is the "deliver[y of] . . . money or other thing of value." This court has held that each such delivery to a union official constitutes a separate Taft-Hartley violation. *See United States v. Alaimo*, 297 F.2d 604 (3d Cir. 1961), *cert. denied*, 369 U.S. 817, 82 S.Ct. 829, 7 L.Ed.2d 784 (1962). Because the Act proscribes indirect, as well as direct payments to union officials, *see Korholz v. United States*, 269 F.2d 897 (10th Cir. 1959), *cert. denied*, 361 U.S. 929, 80 S.Ct. 367, 4 L.Ed.2d 352 (1960), it is also clear, and we do not understand appellants to dispute, that separate indirect payments may constitute separate violations.

Thus, to the extent that appellants attack the indictment, their claim is without merit. We believe that it properly alleges that by paying APL four times for the monthly use of the 1975 Lincoln, UCI delivered four "things of value" to Sheeran. As we understand it, however, appellants' primary contention concerns the lack of proof necessary to establish multiple Taft-Hartley violations, and thus to satisfy the RICO plurality requirement.

### B.

The following is a summary of the evidence presented at trial concerning the automobile lease transaction. Co-defendant Robert Rispo and government witness Charles Allen testified that Eugene Boffa, Sr. and Sheeran agreed that Sheeran could use automobiles furnished by Boffa without charge. Rispo stated that Sheeran told him that he was to have free use of the car during the entire lease period, and that Sheeran did not have to renew on a monthly basis. Allen also testified that Sheeran had boasted that he was not expected to pay for the cars.

Eugene Boffa, Sr. and Louis Kalmar, Sr. each owned fifty percent of UCI and APL. Although both managed UCI, Kalmar did not participate in the management of APL. Eugene Boffa, Sr. purchased the 1975 Lincoln Continental on March 4, 1975 with UCI funds, but the car was titled in the name of APL. The evidence suggested that it was purchased specifically for Sheeran. The transaction was treated as a loan receivable from UCI to APL on the books of UCI and a loan payable from APL to UCI on the books of APL.

There was conflicting evidence as to whether UCI or Sheeran was the lessee of the car. A Ford Motor Company lease security agreement listed UCI as the lessee of the car, while a written lease executed between Sheeran and APL dated March 21, 1975, designated Sheeran as the lessee. The Government also offered into evidence dual monthly invoices on the car from APL. The invoices, of the same date for each month, were for the same car and purportedly went both to UCI and Sheeran. A bookkeeper for APL who regularly handled monthly billing testified, however, that she had not processed any invoices from APL to Francis Sheeran. The Government introduced monthly checks from UCI to APL that included the payments on the 1975 Lincoln used by Sheeran, two of which were signed by Kalmar. The evidence showed

that each such payment was credited to the UCI account at APL. Bookkeepers at APL testified that Sheeran's name was not in the records of APL during the lease period, and that his name was inserted in the books only after a grand jury subpoenaed the records [6].

Appellants argue that under these facts, no jury could conclude beyond a reasonable doubt that each monthly payment constituted a thing of value, and thus a separate Taft-Hartley violation. In support of this contention, appellants first point out that Sheeran had no knowledge or interest in the mechanics of the arrangement between UCI and APL. He knew only that he was receiving continuous, uninterrupted use of the automobile for free; "no evidence was presented that he had any comprehension that he was getting free 'use per month' of the car."

This argument misconceives the relevant inquiry under 29 U.S.C. § 186(a) by assuming that the focus is on what Sheeran received. It is not. Our concern is with what appellants delivered. Thus, it is immaterial whether Sheeran knew that the car was paid for on a month-to-month basis, or even whether the car was owned by UCI or APL.

Appellants' second argument is more troubling. They contend that because of the substantial identity of APL and UCI, the monthly payments were merely a sham, in the nature of intracorporate transfers, that served only to cover up the true nature of the transaction: a gift from UCI to Sheeran of four months' free use of the automobile. In appellants' view, the lease payments could not constitute "things of value" because UCI, in effect, already owned the automobile. Thus, when UCI gave Sheeran the car for four months, it gave him a single "thing of value"—the use of its car—for a four-month period. Appellants urge that the Government's attempt to cast this unitary delivery into four temporal units is impermissible.

---

6. The falsification of APL's records forms the basis for the indictment's obstruction of justice allegations against Eugene Boffa, Sr.

The Government's position is that UCI acquired its interest in the automobile only by virtue of its monthly lease payments to APL. With each lease payment, UCI acquired one month's use of the car, and it was this "thing of value," the Government contends, that it gave to Sheeran on four separate occasions.

It is not our role to resolve disputed questions of fact on appeal. Rather, we must determine whether a jury could reasonably conclude that each monthly lease payment made by UCI was a separate "thing of value." We believe that a reasonable jury could so conclude. First, UCI and APL were in fact separate corporate entities, incorporated twelve years apart, and engaged in different businesses. Second, UCI was actually billed each month by APL for the use of the car. Third, it is undisputed that UCI paid APL each month for the use of the car. Finally, these payments were recorded on the books of APL as genuine accounts receivable. From this, the jury could have concluded that UCI was treated by APL in the same manner as any other lessor would have been, and that had UCI stopped monthly payments on the car, Sheeran's use of the car would have been terminated. Such an inference would support the jury's conclusion that each payment was a "thing of value" under 29 U.S.C. § 186(a).

### C.

■ Nor do we believe that the district court's charge to the jury on the question of multiplicity was so deficient as to require reversal. After instructing that the Government must prove each element of a Taft-Hartley violation beyond a reasonable doubt, the court stated:

The term "deliver" means to place or cause to be placed a thing of value within the actual or constructive possession or control by another by direct or indirect means. A "thing of value" used in the statute is anything other than money which has some value. Racketeering Acts 15, 17 through 26 and 37 through 43 allege that the thing of value delivered was the free use of an automobile for a month. . . . It is for you to determine from the evidence whether these items are things of value and whether they were delivered or caused to be delivered by the defendants so charged.

If you find beyond a reasonable doubt that UCI made monthly payments to APL in discharge of Sheeran's monthly rental obligation for the use of the automobile, you may find that each payment constituted a separate delivery of a thing of value.

We think this charge adequately informed the jury that to find that appellants had violated 29 U.S.C. § 186(a) more than once, it must conclude beyond a reasonable doubt that each delivery constituted a thing of value.[7]

### D.

■ Kalmar also challenges his RICO convictions on the ground that the Government introduced insufficient evidence of his involvement in the monthly payments—a single check from UCI to APL signed by him [8]—to support more than one Taft-Hartley conviction. We have reviewed this contention in light of the entire record, and find it without merit. The jury could have reasonably inferred that Kalmar had directed each of the four payments from the following evidence: 1) Kalmar's control and ownership of fifty-percent of UCI; 2) the

7. Kalmar contends that the second paragraph of the instruction required the jury to conclude that Sheeran had an actual lease obligation to APL and that UCI's monthly payments were actually credited to Sheeran's account. We think this interpretation of the charge is overly literal. The essence of the instruction is that the jury must find that UCI paid APL on a monthly basis for each month that Sheeran used the car. Moreover, even were we to ac-

cept Kalmar's interpretation, we would regard it as harmless error.

8. Although the Government charged that Kalmar's signature on two checks—one on March 24, 1975 and one on August 8, 1975—supported two distinct Taft-Hartley violations, the jury acquitted Kalmar of the alleged March violation.

testimony of a former UCI controller that Kalmar was aware that Sheeran was using the car; and 3) Kalmar's signature on one of the four checks.

## VI.

Appellants raise the following additional challenges to their RICO convictions.

### A.

■ Appellants argue that the district court failed to instruct the jury that to convict a defendant of a RICO conspiracy, it must find that each appellant personally agreed to commit two predicate acts specified in the indictment. They rely principally on the following passage from *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978):

> To be convicted as a member of an enterprise conspiracy, an individual, by his words or actions, must have objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise *through the commission of two or more predicate crimes.*

*Id.* at 903 (emphasis in original).

In this case, the district court instructed the jury that in order to convict a defendant of a RICO conspiracy, it must conclude beyond a reasonable doubt "that the defendant, with knowledge of the conspiracy, willfully became a member of that conspiracy by agreeing to participate directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity...." The district court defined a "pattern of racketeering" as the commission of "at least two of the acts of racketeering alleged in the indictment." Because we perceive no material difference between the requested jury instruction and the one given by the district court, we conclude that the court did not err in denying appellants' request.

### B.

■ Appellants argue that the indictment's RICO conspiracy charge violates the Constitution's ex post facto clause, and that the district court's instructions failed to cure the constitutional deficiency. Because they did not raise this issue before the district court, appellants urge that the defect is plain error under Fed.R.Civ.P. 52(b).

The indictment charges that appellants conspired to violate 18 U.S.C. § 1962(c) "from on or about January 1, 1969, up to and including the date of the filing of this indictment [July 14, 1980]." RICO became effective on October 15, 1970. From this, appellants contend that the jury could have convicted them of RICO conspiracy on the basis of an agreement to violate the substantive provisions of RICO that had been formed and existing only before the effective date of the statute. Appellants rely on *United States v. Brown*, 555 F.2d 407 (5th Cir. 1977), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978), in which the court held that, at least in the absence of curative jury instructions, an indictment that charges defendants with a conspiracy prior to the effective date of RICO violates the "ex post facto principle embodied in the due process clause" of the fifth amendment. *Id.* at 420.

The *Brown* decision was grounded on the court's inability to conclude that the defendants' conspiracy convictions were based only on conspiracies that were in existence after the effective date of the statute. In this case, however, the jury was instructed that it could not convict appellants of a RICO conspiracy unless it found that the conspiracy existed after July 14, 1975. Although the instruction was given because of the five year statute of limitations for RICO offenses, 18 U.S.C. § 3282, it allows us to conclude with certainty that the jury verdict was not based on a conspiracy that existed only prior to the effective date of RICO. We thus find no reversible error.

### C.

■ Appellants contend that the district court failed to instruct the jury that the predicate acts alleged in the indictment must be related to each other to establish the "pattern of racketeering activity" nec-

essary for a RICO conviction. Because no objection was made in the district court, appellants urge, as they must, that this failure constitutes plain error under Fed.R. Civ.P. 52(b). The plain error doctrine, however, does not aid appellants. Because appellants do not assert that the predicate acts charged in the indictment were in fact unrelated, they cannot argue that they have been prejudiced by the district court's failure to give the instruction they now argue was necessary.

### D.

■ Kalmar argues that a Taft-Hartley violation is a lesser included offense of a substantive RICO violation, and that the district court erred in refusing his request for a lesser included offense instruction. We disagree.

Congress generally does not intend to permit multiple convictions or consecutive punishment where the same criminal activity constitutes greater and lesser included offenses. Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The Supreme Court, however, has held that Blockburger is merely a rule of statutory construction, Whalen v. United States, 445 U.S. 684, 691, 100 S.Ct. 1432, 1437, 63 L.Ed.2d 715 (1979), and that where Congress obviously intended to permit multiple convictions and consecutive punishment, Blockburger will not prevent it. Federal courts of appeals have consistently held that Congress did not intend for a RICO conviction to immunize a defendant from a conviction and sentence on the predicate crime. E.g. United States v. Rone, 598 F.2d 564, 571 (9th Cir.), cert. denied, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). "There is nothing in the RICO statutory scheme which would suggest that Congress intended to preclude separate convictions or consecutive sentences for a RICO offense and the ... predicate crimes which make up the racketeering pattern...." See United States v. Scotto, 641

F.2d 47 (2d Cir. 1980), cert. denied, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981); United States v. Boylan, 620 F.2d 359 (2d Cir.), cert. denied, 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980); United States v. Rone, 598 F.2d 564 (9th Cir.), cert. denied, sub nom. Little v. United States, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980).

In Sansone v. United States, 380 U.S. 343, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965), the Supreme Court used a test identical to the one in Blockburger to determine when a defendant is entitled to a lesser included offense instruction. Although the two offenses meet the facial requirements of the Sansone test, a lesser included offense instruction would be inconsistent with Congress's intention to permit multiple convictions and consecutive punishment for RICO and predicate crimes. Under Kalmar's requested instruction,[9] the jury would have first considered Kalmar's guilt or innocence on the RICO charge; only after it had acquitted Kalmar on that charge could it consider his guilt or innocence on the Taft-Hartley violation. We believe that such an instruction is inconsistent with congressional intent and hold that the district court properly rejected it.

### E.

■ Eugene Boffa, Sr. contends that he was denied effective assistance of counsel because his prior attorney cross-examined a government witness whom he had previously represented in her successful attempt to obtain immunity. Because this issue was not raised in the district court, we decline to consider it on direct appeal. See, e.g., United States v. Jackson, 649 F.2d 967, 973 (3d Cir. 1981).

### F.

■ Appellants urge that the judgments of forfeiture must be reversed for a number of reasons. Although they claim that these objections were raised before the district court, we have examined the record

9. Kalmar requested the instructions set out in Devitt & Blackmar, Federal Jury Practice and

Instructions, §§ 18.05–18.07.

citations supplied by appellants, and cannot agree. These arguments, which primarily concern the special interrogatories submitted to the jury, should not be considered for the first time on appeal.

One contention does, however, merit additional discussion. Appellants argue that the judgments of forfeiture must be reversed because the indictment failed to specify the extent of their interests that were subject to forfeiture, as required by Fed.R.Crim.P. 7(c)(2) ("No judgment of forfeiture may be entered . . . unless the indictment . . . shall allege the extent of the interest or property subject to forfeiture.").

The indictment alleges that "all [of each appellant's] control and ownership" in the enumerated corporations was subject to forfeiture. Appellants contend that the indictment is deficient because it fails to specify each appellant's interest in the various corporations. In *United States v. Grammatikos*, 633 F.2d 1013, 1024 (2d Cir. 1980), the United States Court of Appeals for the Second Circuit rejected a similar contention:

> The validity of appellant's contention rests upon his construction of the Rule to read ". . . the indictment or the information shall allege the . . . property subject to forfeiture." We find this interpretation to be grammatically implausible and to subvert the literal terms of the Rule.

We share the Second Circuit's interpretation of the rule, and hold that by alleging that all of appellants' interest in the enumerated corporations was subject to forfeiture, the indictment alleged the "extent of the interest or property subject to forfeiture," as required by Rule 7(c)(2). *See United States v. Bergdoll*, 412 F.Supp. 1308, 1318–19 n.17 (D.Del.1976).

### G.

Appellants raise a number of other contentions involving 1) the district court's failure to include certain instructions requested by the defense in its charge to the jury; 2) the special interrogatories and summary verdict sheet submitted to the jury; and 3) allegedly improper prosecutorial comments made during summation. We have examined these contentions in light of the entire record and find no reversible error.

### VII.

We will reverse the convictions of Eugene Boffa, Sr. and Chandler Lemon of seven counts of mail fraud and remand for a new trial on the proper portions of counts V through XI of the indictment.

We will reverse the conspiracy and substantive RICO convictions of Robert Boffa, Sr. and Chandler Lemon, and remand for a new trial on the proper portions of Counts I and II of the indictment. In addition, we will vacate the judgments of forfeiture entered after their convictions on these counts. *See* 18 U.S.C. § 1963(a) (interest or property shall be forfeited by "[w]ho[m]ever violates any provision of section 1962 of this chapter").

Because we have not disturbed the jury's findings on the six racketeering activities that support the RICO convictions of Eugene Boffa, Sr.—five violations of 29 U.S.C. § 186(a) and one violation of 18 U.S.C. § 1503—we will affirm his conspiracy and substantive RICO convictions. The district court may have considered the mail fraud predicate acts in sentencing, however, and thus we will direct that the district court vacate such sentence and resentence Boffa in light of our invalidation of the indictment's mail fraud allegations. Finally, we will vacate the judgment of forfeiture as it applies to Boffa, so that the district court may have the opportunity to consider whether our disposition of this appeal in any way affects its prior forfeiture order.

We will affirm the RICO convictions of Louis Kalmar, Sr., which were grounded entirely upon four violations of 29 U.S.C. § 186(a). We will, however, vacate the judgments of forfeiture entered against Kalmar to permit the district court to consider the effect, if any, of our disposition of this appeal upon the forfeiture order.[10]

---

10. Kalmar asks us to reverse his RICO convictions and remand for a new trial if we find the

mail fraud allegations in the indictment defi-

cient. Although he recognizes that his RICO convictions were not based upon violations of 18 U.S.C. § 1341, he asserts that a new trial is necessary "due to the prejudicial spillover effect" from the evidence introduced at trial concerning the labor switches. We believe the special interrogatories submitted to the jury provided an adequate safeguard against such prejudice. We believe that they insured that in convicting Kalmar, the jury was focused only upon the allegations and the evidence involving the Taft-Hartley violations.

Moreover, the district court cautioned the jury that "each offense and the evidence pertaining to it should be considered separately. Also the case of each defendant should be considered separately and individually. The fact that you may find one or more of the accused guilty or not guilty of any of the offenses charged should not control your verdict as to any other offense or any other defendant."