Donald HOOD, et al., Plaintiffs,

v.

SMITH'S TRANSFER CORPORATION,
et al., Defendants.

No. C 87–0527–L(B).

United States District Court,
W.D. Kentucky,
at Louisville.

April 25, 1991.

Charles Zimmerman, Jr. and William S. Reisz, Louisville, Ky., for plaintiffs.

Hal Bogard, Louisville, Ky., and Alan Croll, Los Angeles, Cal., for defendants.

## MEMORANDUM

BALLANTINE, Chief Judge.

This matter is before the Court on the motion of defendants to dismiss plaintiffs' amended complaint in its entirety. For the reasons explained below, defendants' motion is denied in part and granted in part.

## BACKGROUND

This action involves a dispute concerning an employee stock option plan created by defendant Smith's Transfer Corporation ("Smith's") for the voluntary participation of both its union and non-union employees. Plaintiffs allege numerous causes of action, including claims under the Employee Retirement Income Securities Act, 29 U.S.C. §§ 1001–1242; the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968; the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa; and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78kk.

### The Parties

The ten named plaintiffs are employees of Smith's who chose to participate in its employee stock option plan and gave up a percentage of their wages to do so. Nine of those plaintiffs are members of the International Brotherhood of Teamsters ("Teamsters") and one of them is not a union member.[1] Plaintiffs seek to represent a proposed class of all Smith's employees—union and non-union—who participated in the employee stock option plan. Plaintiffs have filed a motion for class certification which is presently pending before this Court.

Defendant Smith's Transfer Employee Ownership Plan is an employee stock ownership plan (the "ESOP") formed pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. ESOP participants contributed up to 15% of their wages in exchange for shares of Smith's common stock which would be held in trust by the ESOP.

Defendant Smith's is an interstate LTL ("less than truckload") trucking company which was organized as a Virginia corporation and has its principal place of business there. At the time relevant for the purposes of this case, Smith's had approximately 6,300 employees, 72% of whom were members of the Teamsters. Smith's has been the only administrator of the ESOP.

Defendant Sovran Bank, N.A. ("Sovran") is a national banking association and has been the only trustee for Smith's ESOP pursuant to a November 1, 1985 agreement with Smith's, the "Smith's Transfer Employee Ownership Trust Agreement."

Defendants Roger Burbage, Max McFarlin, and Edward Seibert are citizens and residents of Virginia. At the relevant times, Burbage was the Vice President, Chief Financial Officer, and Treasurer of Smith's as well as a director of that company. McFarlin was the Secretary of Smith's; Seibert was the Vice President of Human Resources for Smith's. Burbage, McFarlin, and Seibert are three of the four members of the Committee which administered Smith's ESOP.[2]

---

1. The ten named plaintiffs are Donald Hood, David Arensmand, Yarmond Toby, Gerald Risinger, Glen Todd, William Lampkin, Joseph Murphy, Robert Bruner, James Yates, and Gary Barnett. Gerald Risinger has not been a member of the Teamsters, or any other union, at any relevant time.

2. The fourth member of the Committee, George Bird, has not been named as a defendant. Mr. Bird is a Smith's employee and a member of the Teamsters.

Defendant ARA Services, Inc. ("ARA") is a corporation which was organized in Delaware and has its principal place of business in Pennsylvania.

### The Facts

In 1980, Smith's became a wholly-owned subsidiary of ARA. In 1984, a group of investors led by ARA management acquired ownership of ARA through a leveraged buyout. Defendant Roger Burbage was one of ARA's new owners after the 1984 buyout. That buyout caused the investors to incur an approximate 1.2 billion dollar debt which ARA assumed and distributed proportionally among its subsidiaries. ARA allocated sixty-five million dollars of that debt, referred to as the "push-down debt," to Smith's which began to pay the push-down debt from its operating revenues.

On September 24, 1985, Smith's Board of Directors approved the ESOP and, thereafter, the senior management of ARA and Smith's began to implement the ESOP. By the end of September 1985, Smith's had filed a first Registration Statement with the Securities Exchange Commission ("SEC") and began a campaign to secure employee participation in the ESOP.

In November of 1985, Smith's and ARA distributed a Prospectus [3] for the ESOP (dated November 12, 1985) to Smith's employees. The Prospectus states that the ESOP's purpose was to generate cash flow sufficient to meet fleet and terminal requirements over the next five years by reducing Smith's wage and salary costs from January 1, 1986 to September 30, 1991 (the "program period"). It further stated that the ESOP's principal elements were (1) for eligible employees voluntarily to elect to participate and (2) for those participants to make an agreement irrev-

ocable for the program period to forego a certain percentage of their hourly wage.[4]

In exchange for the wage reduction, Smith's was to offer up to 4,803,922 shares of its common stock with a par value of $1 per share over the program period. One time per fiscal year, those shares would be distributed to individual employee accounts held by Sovran, the ESOP trustee. The number of shares distributed would depend on the level of employee participation in the ESOP. The Prospectus provided that Smith's Board of Directors [5] could terminate the ESOP at any time, but that any such termination would not affect the participants' rights to the shares allocated to their accounts.

The Prospectus clearly warned prospective participants of the risks involved in choosing to participate in the ESOP. *First,* the Prospectus unambiguously provided that the value of the wages given up was not guaranteed to be equal to the fair market value of the shares received. On page 6, the Prospectus states that:

> [t]he 15% reduction of hourly wage rates or salaries was determined without any regard to the actual fair market value of the shares. In addition, since the fair market value of the shares of Common Stock received by participants in the Plan will be substantially less than the value of the wages and salaries foregone during the Program Period, participation in the Program and the Plan will have a direct net economic cost to participants.

On page 8, the Prospectus states that there will be a disparity in the fair market value of the shares and the wage reduction. The wage reduction would cost employees approximately $44 per share, while the preliminary independent fair market value appraisal was $10 per share.

*Second,* on pages 6 and 8, the Prospectus plainly states that there was no ready mar-

---

**3.** In September of 1985, Smith's filed this Prospectus, along with the Registration Statement, with the SEC.

**4.** The percentages of wages to be foregone would be as follows: (1) 15% for employees being paid the standard contract rate; (2) 10% for collective bargaining employees paid 90% of

the standard contract rate; and 5% for collective bargaining employees paid 80% of their standard contract rate.

**5.** Upon implementation of the ESOP, Smith's Board of Directors was to include three disinterested directors chosen by the employees.

ket for Smith's Common Stock. The Prospectus also warned, on page 10, that a ready market might never exist for that stock because Smith's could not guarantee continued profitable operations after implementation of the ESOP.

The Prospectus also clearly stated that, as a matter of union policy, the Teamsters, which represented the majority of Smith's employees, refused to recommend or approve formally to its membership any ESOP proposed by a trucking company. Although the Teamsters refused to recommend or approve Smith's ESOP, they did not condemn that ESOP. After several meetings with Smith's management, Teamsters officials decided to take a neutral stance on the ESOP and consented to the direct solicitation of individual employees, provided that all of Smith's employees, including non-union employees, could also participate in the ESOP.

After distribution of the Prospectus, Smith's held numerous meetings to inform employees about the ESOP and to encourage their participation in an effort to obtain its goal of 90% participation. Smith's thereafter attempted to secure more participation and began telling employees that their future job security depended upon their participation in the ESOP.

At some of these meetings, Smith's showed the employees a videotape that contained a further explanation of the ESOP and its significance to Smith's. Plaintiffs contend that, on the videotape, Joseph Gilbert, Chief Executive Officer of Smith's, Jack Holder, President of Smith's, and Jake Smith, Smith's former owner, stressed that (1) the ESOP's implementation was necessary to Smith's survival and, consequently, the employees' job survival and (2) the funds from the ESOP would be spent *solely* for new equipment and terminal improvements. Plaintiffs also claim that in those meetings, Smith's officers denied that any ESOP funds would be used to repay the push-down debt or to benefit ARA.[6]

Eventually, Smith's secured a little over 70% participation rate in the ESOP. Smith's Board elected to implement the ESOP on December 23, 1985 and actually implemented the ESOP on January 1, 1986, whereupon those employees who elected to participate had their wages reduced.[7] On September 29, 1986, the ESOP's annual valuation date, Smith's transferred 355,000 shares of Smith's to the employees individual ESOP accounts. On April 7, 1987, plaintiffs were told that the value of their shares had increased and were worth $11.00, a one dollar increase from the $10.00 Prospectus value.

Plaintiffs allege that around March 1, 1987, Smith's and ARA began secret negotiations under the code name "Spain Project" with American Carriers, Inc. and in June 1987, it was recommended that Smith's combine with American Carriers. Smith's contends that owing to losses incurred in 1987, Smith's Board and ARA determined that Smith's needed either to liquidate or combine with a healthy carrier.[8]

On June 26, 1987, ARA and Smith's entered into an agreement with American Carriers under which American Carriers would acquire 100% of Smith's stock from ARA. As part of that agreement, ARA agreed to purchase all the 830,000 shares distributed to the Smith's ESOP participants for $1.12 per share, whereupon Smith's Board would terminate the ESOP. The $1.12 per share valuation allegedly was the result of an independent appraisal by Willamette Management Associates, Inc.

---

**6.** The Prospectus' description of Smith's debt structure, however, included a description of the "push-down" debt—the $55 million allocated portion of the debt incurred in December 1984 in the buyout of ARA.

**7.** Those employees who chose not to participate continued to receive their full wages. Those employees hired after the ESOP's implementation were told that participation was mandatory.

**8.** Smith's claims to have suffered losses of about $11,200,000 in the first half of fiscal 1987 and a total operating loss in excess of $26,000,000 for that fiscal year.

("Willamette").[9]

On June 19, 1987, Smith's associate general counsel, Thomas Morton, told certain directors and financial consultants of Smith's that the tentative merger price of the shares was $1.12 per share for a total of 14 million dollars, 17 million dollars less than the total paid by Smith's employees for their shares.

On June 26, 1987, Smith's Board of Directors approved the merger with American Carriers. The merger plan provided for termination of the ESOP on October 1, 1987, with Smith's employees receiving $1.12 per share. Plaintiffs allege that despite approval of the merger and ESOP termination, Smith's continued to "peddle" shares to the employees by maintaining the ESOP in operation and continuing the 15% wage reduction of participating employees. Plaintiffs claim that between June 1987 and the termination of the plan in October 1987, Smith's and ARA extracted an additional seven million dollars from the ESOP participants.

On September 3, 1987, prior to the ESOP's termination, Smith's sent all shareholders of record, including Sovran Bank, the Trustee, a detailed Proxy Statement on the proposed merger. That Proxy Statement provided that Smith's stock was worth $1.12 per share, a price that was the product of Willamette's fair market value appraisal rather than of merger negotiations.

On October 2, 1987, ARA transferred another 355,000 shares to the Smith's employees in accordance with the ESOP and immediately thereafter, ARA purchased all the employees' shares in the ESOP for $1.12 per share. ARA then terminated the ESOP.

### The Complaint

In August 1987, plaintiffs commenced this action by filing a three count complaint which alleges violations of the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C. §§ 1001–1242, in connection with Smith's ESOP. Plaintiffs seek compensatory damages, costs and attorney fees, and preliminary and permanent injunctive relief for those alleged violations.

In Count 1 of their original complaint, plaintiffs allege that (1) according to the definition contained in ERISA at 29 U.S.C. § 1002(21)(A), Sovran, Smith's, Burbage, McFarlin, and Seibert were "fiduciaries" of the Smith's ESOP and (2) while acting in their capacity as ESOP fiduciaries, those defendants violated section 404 of ERISA, 29 U.S.C. § 1104, by failing to discharge their duties (a) solely in the interest of the ESOP participants and beneficiaries, (b) with the care, skill, and diligence of a prudent man in like circumstances, and (c) in accordance with the governing documents and instruments.

In Count 2, plaintiffs allege that Smith's, Sovran, Burbage, McFarlin, and Seibert violated section 406(a)(1) of ERISA, 29 U.S.C. § 1106, by acquiring Smith's shares on behalf of the ESOP and its participants for consideration exceeding the represented and actual fair market value of the shares.

In Count 3, plaintiffs allege that Smith's, Sovran, Burbage, McFarlin, and Seibert would violate their fiduciary duties under ERISA should they proceed with the sale of Smith's to American Carriers pursuant to the agreement which provided for the purchase of Smith's shares from the ESOP for $1.12 per share.

In 1988, plaintiffs filed a first amended complaint alleging violations of three other federal statutes in addition to ERISA—the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa; the Securities Exchange Act of 1934, 15 U.S.C. §§ 77a–78kk; and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. In their complaint, plaintiffs seek compensatory damages, treble damages for their RICO claim, attorneys fees, and costs.

---

**9.** Plaintiffs also allege that Smith's did not disclose two other valuations—one stating the shares were worth $2–3 each and one stating the shares were worthless—given by independent appraisers during the June meeting from which the agreement for American Carriers' purchase of Smith's arose.

The first two counts of the amended complaint are the same as in the original complaint with the exception of the addition of defendant ARA. In their amended complaint, however, plaintiffs dropped their claim for injunctive relief under ERISA articulated in the third count of their original complaint because the acts plaintiffs sought to enjoin had already occurred. On October 4, 1987, the sale of Smith's to American Carriers was consummated after being approved by the Interstate Commerce Commission and, pursuant to the terms of the agreement of sale among ARA, Smith's, and American Carriers, Smith's repurchased the ESOP shares and terminated the ESOP. Therefore, instead of seeking injunctive relief, plaintiffs' third count now seeks (1) damages for these consummated acts which they allege to be violations by Smith's, Sovran, ARA, and Seibert of the fiduciary and contractual duties set forth in section 404 of ERISA and (2) rescission of their participation in the ESOP with restitution of the wages foregone.

In Counts 4, 5, and 6 of their amended complaint, plaintiffs allege that various defendants violated the "anti-fraud" provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934 (collectively "the Securities Acts"). In Count 4, plaintiffs allege that Smith's, ARA, and Burbage violated the 1933 Act, 15 U.S.C. §§ 77k and 77*l*, by making various material misrepresentations, including some statements in the Prospectus, concerning the value of shares and the intended use of ESOP proceeds. In Counts 5 and 6, plaintiffs allege that "various" defendants violated the 1934 Act by violating several rules, Rule 10b–5 [17 C.F.R. § 240.10(b)(5)] and Rule 14a–9 [17 C.F.R. § 240.10(a)(9)], enacted pursuant thereto. Plaintiffs allege that Smith's, ARA, and Burbage violated Rule 10b–5 by making material fraudulent misrepresentations in connection with the sale of their interests in the ESOP. Plaintiffs allege that Smith's and ARA violated Rule 14a–9 by issuing a false and misleading Proxy Statement.

In Count 7 of their amended complaint, plaintiffs allege that Smith's, ARA, Sovran, and Burbage violated RICO, 18 U.S.C. § 1962(c), by associating to combine in a pattern of racketeering activity consisting, *inter alia*, of the following predicate acts: (1) mail and wire fraud, 18 U.S.C. §§ 1341 and 1343, for the mailing of material which violated the anti-fraud provisions of the Securities Acts; (2) extortion, 18 U.S.C. § 1951, for the use of fear and intimidation in seeking to secure participation in the ESOP; and (3) extortion and interference with judicial process, 18 U.S.C. §§ 1951 and 1503, for using fear and intimidation to prevent plaintiff Gerald Risinger from participating in this action.

## MOTION TO DISMISS

Defendants have filed a motion to dismiss plaintiffs' complaint in its entirety pursuant to Rule 12(b) of the Federal Rules of Civil Procedure. In their briefs in support of that motion, defendants assert two grounds for dismissal. First, they contend that, pursuant to Rule 12(b)(1), dismissal is warranted because this Court lacks subject matter jurisdiction over plaintiffs' claims which they argue are subject to the exclusive jurisdiction of the National Labor Relations Board ("NLRB"). Second, they contend that, pursuant to Rule 12(b)(6), dismissal is warranted because plaintiffs have failed to state a claim for relief under any of the federal statutes named in the complaint.

### A. *Rule 12(b)(1): Lack of Subject Matter Jurisdiction*

1. National Labor Relations Act Preemption

Defendants contend that this Court lacks subject matter jurisdiction because plaintiffs' claims are, in essence, unfair labor practices which are within the exclusive jurisdiction of the National Labor Relations Board ("NLRB"). In *San Diego Building Trade Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), the Supreme Court pronounced a general rule concerning the preemptive effect of the National Labor Relations Act ("NLRA").

When an activity is arguably subject to § 7 or § 8 of the [National Labor Relations] Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board *if the danger of state interference with national policy* is to be averted.

*Id.* at 245, 79 S.Ct. at 780 (emphasis added).

Defendants claim that this *Garmon* preemption rule applies to plaintiffs' claims. Defendants characterize plaintiffs' claims as seeking remedies for unfair labor practices—*i.e.*, coercing plaintiffs into ESOP participation and unilaterally changing employment terms and conditions—rather than as seeking remedies for violations of ERISA, RICO, and the Securities Acts. Defendants contend that because these alleged unfair labor practices are "arguable violations" of sections 7 and 8 of the NLRA,[10] they are preempted by that Act and within the exclusive jurisdiction of the NLRB. Defendants' reliance upon *Garmon* preemption, however, is misplaced.

■ *First,* the doctrine of preemption originates from the Supremacy Clause of the United States Constitution, which provides that the laws of the United States are "supreme" and binding on judges in every state. U.S. Const. Art. VI, cl. 2. The Supremacy Clause "comes into play" only when a case involves a conflict between a federal and a state law, not when it involves a conflict between two federal statutes. *Marvin Tragash Co. v. United States Dept. of Agriculture*, 524 F.2d 1255, 1257 (5th Cir.1975). When a case presents a conflict between two federal statutes, it is not within the preemption doctrine. *New York Tel. Co. v. New York State Dept. of Labor*, 440 U.S. 519, 539 n. 32, 99 S.Ct. 1328, 1340 n. 32, 59 L.Ed.2d 553 (1979).

*Second, Garmon* did not concern the preemption of claims asserted under federal statutes, but concerned only the preemption of *state* laws which interfered with sections 7 and 8 of the NLRA.[11] Indeed, the Supreme Court has explained that the *Garmon* rule should not be rigidly applied to cases which involve issues arising under laws other than the NLRA and state laws. *Vaca v. Sipes*, 386 U.S. 171, 179, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967)). *See also Storey v. Local 327, Int'l Brotherhood of Teamsters*, 759 F.2d 517 (6th Cir.1985).

In *Connell Construction Co., Inc. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 626, 95 S.Ct. 1830, 1837, 44 L.Ed.2d 418 (1975), the Court explained that "the federal courts may decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies, including the antitrust laws." [12]

In most cases a decision that state law is pre-empted leaves the parties with recourse only to the federal labor law, as enforced by the NLRB. (citations omitted). But in cases like this one, *where there is an independent federal remedy that is consistent with the NLRA, the parties may have a choice of federal remedies.* (citations omitted).

*Id.* at 635 n. 17, 95 S.Ct. at 1841 n. 17 (emphasis added). *See also Hospital Employees' Div. of Local 79 v. Mercy–Memorial Hosp. Corp.*, 862 F.2d 606, 608 (6th Cir.1988), *vacated on other grounds*, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989) ("The *Garmon* and other doctrines are not designed to preempt other independent rights created by Congress,...."); *Butchers' Union, Local No. 498 v. SDC Inv., Inc.*, 631 F.Supp. 1001, 1007 (E.D.Cal. 1986) ("[W]here Congress has provided remedies for proscribed conduct independent of those available in an NLRB pro-

---

**10.** 29 U.S.C. §§ 157 and 158.

**11.** In *Garmon,* the issue before the Court was whether a California state court had jurisdiction to award tort damages for activities which constituted an unfair labor practice under state law or whether sanction of the activities fell within the exclusive jurisdiction of the NLRB. 359 U.S. at 239, 79 S.Ct. at 776.

**12.** In *Connell,* the issue before the Court was whether a federal court had jurisdiction to adjudicate claims under the Sherman Act, 15 *U.S.C.* § 1 *et seq.,* when the alleged conduct which formed the basis of the antitrust claims also constituted conduct "arguably subject to" sections 7 or 8 of the NLRA. 421 U.S. at 620–21, 95 S.Ct. at 1834.

ceeding, the preemption doctrine has no application.").

Therefore, plaintiffs' complaint does not raise any issue of preemption regardless of the characterization of their claims.[13] Instead, the issue to be addressed here is a narrow one concerning an apparent conflict between the jurisdictional grants of the NLRA and other federal statutes—ERISA, RICO, and the Securities Acts. The ultimate resolution of this issue depends upon whether: (1) the unfair labor practices alleged by defendants are merely collateral to plaintiffs' non-NLRA federal claims and (2) plaintiffs' non-NLRA federal claims arise under statutes which provide independent federal remedies. *Connell, supra.*

■ For at least three reasons, defendants' assertions of "preemptive" unfair labor practices concern matters that are collateral to plaintiffs' complaint. *First,* the gist of plaintiffs' complaint concerns alleged acts taken with respect to the operation and termination of the ESOP, acts that included fraudulent misrepresentations and omissions, breaches of fiduciary duties, and extortion. Plaintiffs' complaint does not seek a remedy under the NLRA for any unfair labor practice, but seek remedies solely under ERISA, RICO, and the Securities Acts.

*Second,* NLRA sections 7 and 8 protect rights associated only with collective bargaining. Participants in Smith's ESOP did not have to be union members. Indeed, the proposed class of plaintiffs includes both union employees and non-union employees, who would not be covered by any collective bargaining agreement. Thus, the non-un-

ion plaintiffs here may not be proper parties to an unfair labor practice proceeding before the NLRB. *Cf. Carpenters Local Union No. 1846 v. Pratt–Farnsworth, Inc.,* 690 F.2d 489, 519 (5th Cir.1982), *cert. denied,* 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983).

*Third,* and most significantly, the record discloses that, at best, defendants articulate only dubious unfair labor practice claims—unilaterally changing plaintiffs' wages and coercing plaintiffs' participation in the ESOP.[14]

Defendants are correct in asserting that "[a] unilateral change with respect to a mandatory bargaining subject is a violation of section 8(a)(5)" of the NLRA. *Van Dorn Plastic Machinery Co. v. NLRB,* 736 F.2d 343 (6th Cir.1984), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1173, 84 L.Ed.2d 323 (1985). Wages are a mandatory subject of collective bargaining and, therefore, a unilateral change in an existing wage structure achieved through collective bargaining violates the NLRA. *NLRB v. Allied Prod. Corp.,* 548 F.2d 644 (6th Cir.1977).

■ Nevertheless, the record reveals that defendants' allegations of an unilateral wage reduction are without merit. The record establishes that the Teamsters waived its right to bargain collectively over the wage reduction connected with implementation of the ESOP. The Prospectus, which defendants prepared, clearly states that *as a matter of Teamsters policy,* the Teamsters would not formally approve or recommend any ESOP proposed by any employer in the trucking industry. The

**13.** The Court notes that Defendants' incorrectly assert that *Serrano v. Jones & Laughlin Steel Co.,* 790 F.2d 1279 (6th Cir.1986), mandates a conclusion that plaintiffs' claims are preempted by the NLRA and their exclusive remedy lies with the NLRB because that case is plainly distinguishable from this case. The *Serrano* plaintiffs asserted that the federal district court had subject matter jurisdiction over their claims under section 301 of the Labor Management Relations Act and pendent jurisdiction over their state law fraud claims. *Id.* at 1282–83. There, the Court held that federal labor law preempted plaintiffs' state law claims, but retained jurisdiction over the section 301 claim. *Id.* at 1288. By contrast,

plaintiffs here do not base subject matter jurisdiction in this Court on section 301 and do not assert any pendent state law fraud claims. Instead, plaintiffs here assert only federal law claims under the Securities Acts, ERISA, and RICO, and subject matter jurisdiction lies with this Court under those federal laws.

**14.** The Court does not intend this opinion to decide any potential unfair labor practice claims. However, the Court believes that the obvious problems in defendants' contentions underscore the tenuous, collateral nature of their alleged unfair labor practice contentions and, for that reason alone, points those weaknesses out.

**1284**

Prospectus also states that Teamsters officials met with management several times concerning the ESOP and that those officials gave permission for the direct solicitation of Teamsters members for ESOP participation, as long as participation was extended to non-Teamsters employees as well. Thus, it appears that Smith's had an enforceable waiver from the Teamsters' of the right to bargain collectively over the ESOP's wage reduction element. *NLRB v. Black–Clawson Co.*, 210 F.2d 523, 524 (6th Cir.1954).

Moreover, Smith's complied with the Teamsters officials' condition by making the ESOP available to both union and non-union employees, and took advantage of the Teamsters' permission to circumvent the collective bargaining process and to solicit directly employees for participation. Therefore, the Court concludes that Smith's implementation of the ESOP was not an attempt to circumvent the collective bargaining process or to diminish the Teamsters' representative role, but was a post-bargaining effort to solicit, with the Teamsters' permission, participation of individual Smith's employees in the ESOP. *See Wells v. General Motors Corp.*, 881 F.2d 166 (5th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1959, 109 L.Ed.2d 321 (1990). Because Smith's solicited plaintiffs with the Teamsters' blessing, neither the Teamsters nor plaintiffs would be able to bring a credible NLRB charge and defendants' contention of a "preemptive" unfair labor practice of a unilateral change in wages is without substance. *See United Food & Commercial Workers, Local 204 v. Harris–Teeter Super Markets, Inc.*, 716 F.Supp. 1551, 1559 (W.D.N.C.1989).

■ Similarly, but for different reasons, defendants' contention of an unfair labor practice of coercion is without substance. Defendants rely upon NLRA sections 8(a)(1) and (5) for their assertion that coercion of plaintiffs into ESOP participation constitutes an unfair labor practice. Those sections prohibit coercion only in the contexts of (1) interfering with employees' rights to organize and (2) refusing to bargain collectively. *See* 29 U.S.C. § 158(a)(1) & (5). They do not concern any and all coercion, and do not encompass the coercion alleged here—coercing participation in an employee benefits plan.

Therefore, the Court concludes that any unfair labor practices which plaintiffs' complaint may implicate are collateral to their other federal claims.

Next, turning to the question of independent federal remedies, the Court concludes that the four federal statutes under which plaintiffs seek relief—ERISA, RICO, and the Securities Acts—each provide plaintiffs federal remedies independent of the NLRA.

**a. *The Securities Acts***

■ With respect to plaintiffs' claims under the anti-fraud provisions of the Securities Acts, the question of independent federal remedies is straightforward. Congress explicitly provided that federal courts have subject matter jurisdiction over actions brought for violations of the anti-fraud provisions of the Securities Acts. 15 U.S.C. § 77 *l*; 15 U.S.C. § 78aa. *See also Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953). Moreover, it is well established that federal courts have *exclusive* jurisdiction for violations of the 1934 Act. *See, e.g., Fradkin v. Ernst*, 571 F.Supp. 829, 839 (N.D.Ohio 1983). In fact, one of the cases relied upon by defendants explicitly states that "a federal court has independent jurisdiction over violations of the Securities Exchange Act." *Brown v. Keystone Consol. Indus., Inc.*, 680 F.Supp. 1212, 1226 n. 10 (N.D.Ill.1988).

Defendants have not cited, nor has the Court found, any authority holding that the NLRB's jurisdiction over unfair labor practices ousts federal courts of their jurisdiction over federal securities violations. Therefore, the Court concludes that the Securities Acts provides plaintiffs with a federal remedy independent of the NLRA, and holds that it has subject matter jurisdiction over plaintiffs claims under those Acts.

**b. *ERISA***

■ With respect to plaintiffs' ERISA claims, the question of an independent fed-

eral remedy is also straightforward. Congress explicitly provided that the district courts of the United States have jurisdiction over civil ERISA actions brought by plan participants or beneficiaries. 29 U.S.C. § 1132(e). As one court explained, "[t]here can be no doubt that ERISA provides a remedial scheme independent of the NLRA." *Pratt–Farnsworth*, 690 F.2d at 519. With ERISA, Congress enacted a liability-creating statute to provide for judicial relief in federal courts for the type of wrongful conduct plaintiffs allege in their complaint. *Harris–Teeter*, 716 F.Supp. at 1558. *See also Painters' Pension Trust Fund v. Manganaro Corp.*, 693 F.Supp. 1222 (D.D.C.1988); *Michigan United Food & Commercial Workers Union v. Baerwaldt*, 572 F.Supp. 943 (E.D.Mich.1983), *rev'd on other grounds*, 767 F.2d 308 (6th Cir.1985). *Cf. Mercy–Memorial Hosp.*, 862 F.2d at 608 (Section 302 of the LMRA "is an independent liability-creating statute enacted by Congress to provide additional judicial remedies for certain wrongful conduct.").

Any reliance by defendants on *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co. Inc.*, 484 U.S. 539, 108 S.Ct. 830, 98 L.Ed.2d 936 (1988), for a contrary conclusion is misplaced. In *Advanced Lightweight*, the plaintiffs were trustees of a multi-employer pension plan who claimed that the defendant/employer violated NLRA section 8(a)(5) by unilaterally deciding to discontinue contributions to the pension plan after the expiration of the collective bargaining agreement's term. *Id.* at 541–42, 108 S.Ct. at 832. Plaintiffs contended that the federal district court had subject matter jurisdiction over that claim, an obvious unfair labor practice, under ERISA sections 502(g)(2) and 515.

The Supreme Court held that the federal district court did not have jurisdiction over the trustees' suit to recover plan contributions because the defendant remained obligated to make contributions after the expiration of the collective bargaining agreement only because of its duty under the NLRA to bargain in good faith. *Id.* The Supreme Court, however, did not hold that federal courts never have jurisdiction over actions to collect delinquent contributions. To the contrary, it simply limited federal court jurisdiction over such actions to those involving claims for contributions *already promised*, and refused to extend jurisdiction to claims for contributions owed only by virtue of the good faith bargaining duty arising under NLRA section 8(a). *Harris–Teeter*, 716 F.Supp. at 1558; *Painters' Pension Trust Fund*, 693 F.Supp. at 1223. In other words, in *Advanced Lightweight*, the Supreme Court merely held that "federal courts are empowered to entertain certain actions for contractual relief under ERISA, but lack jurisdiction to entertain actions for noncontractual remedies under the NLRA." *Painters' Pension Trust Fund*, 693 F.Supp. at 1223.[15]

Unlike the *Advanced Lightweight* plaintiffs, plaintiffs here do not seek any remedy through ERISA for an unfair labor practice for the violation of a noncontractual right guaranteed only by sections 7 or 8 of the NLRA. Instead, plaintiffs here seek a remedy for a violation of their rights under ERISA, and any unfair labor practice arising from the same facts as the ERISA violations alleged by plaintiffs is merely collateral to the independent federal remedy provided by ERISA. *See supra* at 1283–84.

Therefore, as with the Securities Acts, the Court concludes that ERISA provides plaintiffs with a federal remedy independent of the NLRA, and holds that it has subject matter jurisdiction over plaintiffs' ERISA claims.

#### c. *RICO*

With respect to plaintiffs' RICO claim, the question of an independent federal remedy is more complex. Like ERISA and the Securities Acts, RICO provides that federal district courts have jurisdiction over civil

---

**15.** Given statements in the Prospectus that ERISA and the Securities Acts would be applicable to Smith's ESOP, the Court concludes this is not only a legally correct result, but a fair one as well.

RICO actions and seems to provide a federal remedy independent of the NLRA. 18 U.S.C. § 1964. However, RICO differs from those two other federal statutes in one significant respect.

To state a claim under RICO, a plaintiff must allege a pattern of racketeering activity which, for purposes of the statute, must consist of at least two predicate acts—*i.e.*, two other criminal offenses, including, *inter alia*, interference with commerce by robbery or extortion, securities fraud, and indictable acts under section 302 of the NLRA. 18 U.S.C. §§ 1961(1) and (5). A conflict between the jurisdictional grants in the NLRA and RICO appears to arise when the alleged predicate acts underlying a RICO claim are unfair labor practices which violate NLRA sections 7 and 8. This apparent conflict arises in such cases because, in order to determine whether the RICO claim is viable, the court first would have to determine the central issue of the predicate acts, which would require a decision of labor law normally reserved for the NLRB.

■ Defendants argue that the predicate acts plaintiffs allege are actually unfair labor practices and, therefore, plaintiffs have no federal remedy under RICO which is independent of the NLRA. The Court concludes, however, that plaintiffs' RICO allegations are not dependent upon any underlying allegations of unfair labor practices. Instead, plaintiffs allege predicate acts of fraud in connection with the sale of securities, mail and wire fraud in connection with the sale of securities, and various acts of extortion.[16] Moreover, even if plaintiffs' allegations of predicate acts involved unfair labor practices, this Court would not be willing to conclude that it does not have subject matter jurisdiction over plaintiffs' RICO claims.

Several courts have held that the NLRA's exclusive jurisdiction over unfair labor practices "preempts" district court jurisdiction over civil RICO actions if "but for" labor law, the alleged predicate offenses—*i.e.*, racketeering activities—are not illegal.

RICO should be read as limited by the exclusive jurisdiction of the NLRA only when the Court would be forced to determine whether some portion of the defendant's conduct violated labor law before a predicate act would be established. *United States v. Thordarson*, 646 F.2d 1323 (9th Cir.), *cert. denied*, 454 U.S. 1055, 102 S.Ct. 601, 70 L.Ed.2d 591 (1981); *United States v. Boffa*, 688 F.2d 919 (3rd Cir.1982), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983); *Butchers' Union*, 631 F.Supp. at 1010–11. So long as the predicate acts exist independent of any unfair labor practice resolutions, the NLRB's exclusive jurisdiction is not violated since the Court will not be forced to interpret labor law except as a collateral matter. However, if the existence of the predicate acts depends wholly upon a determination that a violation of labor law occurred, jurisdiction is preempted.

*MHC v. International Union, United Mine Workers of America*, 685 F.Supp. 1370, 1376–77 (E.D.Ky.1988). *See also Butchers' Union*, 631 F.Supp. at 1010–11.

These courts would hold that if the alleged predicate acts are illegal only because they were unfair labor practices (*e.g.*, committing wire fraud to deprive plaintiff of rights created by NLRA sections 7 and 8), federal courts should refuse to exercise their jurisdiction over a plaintiff's RICO claims. *Butchers' Union, supra.* These courts reason that, in such cases, federal courts should defer to the NLRB's jurisdiction because the establishment of the un-

---

**16.** Defendants rely upon *Brown v. Keystone Consol. Indus., Inc.*, 680 F.Supp. 1212 (N.D.Ill. 1988), a case in which the court held that the RICO claims were preempted by the NLRA because the underlying predicate acts involved the use of unfair labor practices to further a scheme to deprive plaintiffs of employee benefits promised in a collective bargaining agreement. Defendants' reliance is misplaced. *First,* unlike

*Brown,* this case involves an ESOP and, thus, encompasses the additional aspect of the alleged federal securities laws violations. *Second,* unlike *Brown,* the agreement in issue here—the ESOP—was not the product of the collective bargaining process; it was not implemented by any collective vote, but by the individual employees' decision to participate, with the Teamsters' acquiescence.

fair labor practice would be central, rather than collateral, to the RICO claims. On the other hand, these courts would hold that if the alleged predicate acts are illegal *per se* without any reference to NLRA sections 7 and 8 (*e.g.,* murder and arson), federal courts have jurisdiction over a plaintiff's RICO claims. *MHC, supra.*

■ Thus, these courts have concluded that they must resolve a conflict between the jurisdictional parameters of the NLRB and federal courts by analyzing the predicate acts upon which a RICO claim is based to determine whether they are violations of NLRA sections 7 and 8. This Court disagrees with this analysis for one reason: violations of NLRA sections 7 and 8 can never satisfy the predicate acts requirement of RICO and, accordingly, any jurisdictional conflict between the NLRA and RICO is merely illusory.

Congress did not intend to create new criminal sanctions when it created rights for employees under NLRA sections 7 and 8. To the contrary, Congress intended that those sections serve remedial purposes only. *United States v. Boffa,* 688 F.2d 919, 927–30 (3d Cir.1982), *cert. denied,* 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983). *See also Republic Steel Corp. v. NLRB,* 311 U.S. 7, 10, 61 S.Ct. 77, 79, 85 L.Ed. 6 (1940). The absence of criminal sanctions in sections 7 and 8 "suggests that Congress did not contemplate that employers would be subject to criminal liability, even by operation of another statute, as a result of committing an unfair labor practice." *Boffa,* 688 F.2d at 928. *Cf. United States v. DeLaurentis,* 491 F.2d 208 (2d Cir.1974) (Rights guaranteed by section 7 cannot form the basis of a criminal prosecution under 18 U.S.C. § 241.). Therefore, a section 7 or 8 violation cannot be used to establish the violation of another federal law, such as wire or mail fraud, which might be a predicate act for the purposes of RICO.[17]

Obviously, if a RICO claim cannot be based upon predicate acts of unfair labor practices, there simply can be no problem of a jurisdictional conflict between the courts and the NLRB. In such cases, the NLRB's exclusive jurisdiction to remedy unfair labor practices remains intact as does federal court jurisdiction over civil RICO actions. For this reason, the Court concludes that this case presents no question of a conflict in subject matter jurisdiction between the NLRB and federal courts.

Therefore, as with the Securities Acts and ERISA claims, the Court concludes that RICO provides a federal remedy independent of the NLRA, and holds that it has subject matter jurisdiction over plaintiffs' RICO claim.

### 2. Labor Management Relations Act Preemption

As an alternative to their NLRA "preemption" argument, defendants contend that section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, preempts plaintiffs' claims under ERISA, RICO, and the Securities Acts because those claims "are based on defendants' alleged fraudulent misrepresentations and coercive tactics regarding the ESOP, which is a 'labor contract.'"[18]

■ Defendants are correct in asserting that Section 301 applies to more than straight collective bargaining agreements. Indeed, that section is broad enough to encompass any agreement between *an employer and labor organization* significant to the maintenance of labor peace between them. *Deaton Truck Line, Inc. v. Local Union 612, Int'l Bhd. of Teamsters,* 314

---

**17.** This conclusion is supported by the inclusion of 29 U.S.C. § 186 within the RICO definition of racketeering activity. Some courts believe the inclusion of only this section of the labor laws indicates that Congress did not want other labor-related activities removed from the "ambit of exclusive jurisdiction of the labor law." *Butchers' Union,* 631 F.Supp. at 1009. However, this Court believes that this lone inclusion simply indicates that Congress did not intend the violation of any other labor law statute to constitute a RICO predicate act, even if doing so derivatively through some other federal statute. *See id.*

**18.** Supplemental Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss, p. 24 (filed September 17, 1990).

F.2d 418, 422 (5th Cir.1962). Section 301 is *not* broad enough, however, to encompass contracts directly between *an employer and employees.* To the contrary, unless the contract in issue is between an employer and a labor organization representing employees, it simply is not subject to section 301. *Local 336, Am. Fed. of Musicians v. Bonatz,* 475 F.2d 433, 437 (3d Cir.1973).

The agreement which is the subject of this case is Smith's ESOP. That ESOP is not an agreement between Smith's and the Teamsters, but was agreement between Smith's and each employee who chose to participate in the ESOP. Therefore, the ESOP is not within the scope of section 301 of the LMRA and that section does not preempt plaintiffs' claims.[19]

### B. *Rule 12(b)(6): Failure to State a Claim*

In considering defendants' motion to dismiss for failure to state a claim, this Court must construe plaintiffs' complaint "in the light most favorable to plaintiff[s], and its well-pleaded facts must be accepted as true." *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987).

> Dismissal pursuant to rule 12(b)(6) is proper when it is established beyond a doubt that ... plaintiff[s] cannot prove beyond any set of facts consistent with the allegations that would entitle such plaintiff[s] to relief.

*Collins v. Nagle,* 892 F.2d 489, 493 (6th Cir.1989). *See also Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). Moreover, where, as here, matters outside the pleadings have been presented and not excluded by the Court, defendants' motion to dismiss under Rule 12(b)(6) can be treated and disposed of as a motion for summary judgment under Rule 56.

**19.** The Court finds it important to point out that, even if section 301 of the LMRA preempted plaintiffs' claims under the Securities Acts, ERISA, and RICO, that fact and the resulting altered characterization would not oust this Court of subject matter jurisdiction. The Court would still have subject matter jurisdiction over plaintiffs' section 301 claim. *Serrano v. Jones &*

#### 1. The Securities Acts Claims

Defendants contend that plaintiffs have failed to state a claim under the Securities Acts for four reasons: (1) plaintiffs' allegations of fraud are not specific enough to satisfy Rule 9(b) of the Federal Rules of Civil Procedure; (2) plaintiffs' interests in the ESOP are not within the scope of the Securities Acts; (3) the one alleged material omission upon which plaintiffs rely was clearly revealed to them before they decided to participate in the ESOP; and (4) plaintiffs did not file their claims within the applicable statute of limitations. The Court disagrees with these contentions and, therefore, denies defendants' motion to dismiss plaintiffs' Securities Acts claims.

#### a. *Rule 9(b)*

 Defendants contend that plaintiffs' claims for violations of the Securities Acts' anti-fraud provisions do not contain allegations specific enough to comply with Rule 9(b) of the Federal Rules of Civil Procedure.[20] Defendants contend that those claims must be dismissed because plaintiffs failed to identify with particularity the role each defendant allegedly played in the fraud.

Rule 9(b) provides that "[i]n all cases of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The purpose of Rule 9(b) "is to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading." *Michaels Bldg. Co. v. Ameritrust Co.,* 848 F.2d 674, 679 (6th Cir. 1988). Rule 9(b) must be read in conjunction with Rule 8 which requires pleadings to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief...." *Id.* (quoting Fed.R. Civ.P. 8(a)). Focusing exclusively on Rule

*Laughlin Steel & Co.,* 790 F.2d 1279, 1288 (6th Cir.1986).

**20.** Defendants also allege that plaintiffs did not satisfy Rule 9(b) with respect to their RICO claims. This discussion with respect to the Securities Acts allegations applies equally to the RICO allegations.

9(b) would result in too narrow an approach and would fail " 'to take account of the general simplicity and flexibility contemplated by the rules.' " *Id.* (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1298, at 407 (1969)). *See also Cincinnati Gas & Electric Co. v. General Electric Co.*, 656 F.Supp. 49, 76 (S.D.Ohio 1986).

Reading Rules 8 and 9(b) together, plaintiffs alleging fraud must identify the time and place of the fraud, the contents of the alleged misrepresentations or omissions, and the identity of the party or parties perpetrating the fraud. *Coronet Ins. Co. v. Seyfarth*, 665 F.Supp. 661, 666 (N.D.Ill. 1987). *See also Ingram Indus., Inc. v. Nowicki*, 502 F.Supp. 1060, 1065 (E.D.Ky. 1980). Plaintiffs do not, however, have to plead detailed evidentiary matters. *Coronet*, 665 F.Supp. at 666.

The Court concludes that plaintiffs have stated their claims under the Securities Acts and RICO with sufficient particularity. Contrary to defendants' assertions, plaintiffs have not lumped defendants together, but have set forth the specific action of each defendant in each count. Plaintiffs also have identified the general time, place, and manner of the alleged fraud and the misrepresentation, omissions, and other fraudulent acts upon which their claims are based. Plaintiffs, therefore, have satisfied the pleading requirements of Rule 9(b).[21]

b. *Applicability of the Securities Acts*

■ Defendants contend that the Securities Acts are not applicable here because Smith's ESOP was a voluntary, non-contributory employee benefit plan and, therefore, the interests plaintiffs acquired through that ESOP were not "securities" for the purposes of the Securities Acts.

The Securities Act of 1933 provides that a "security" is:

... any note, *stock*, treasury stock, bond, debenture, evidence of indebtedness, cer-

tificate of interest or participation in any profit-sharing, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas or other mineral rights, ... *or, in general, any interest or instrument commonly known as a 'security,'* or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(1) (emphasis added). The Securities Exchange Act of 1934 contains a similar definition of "security." 15 U.S.C. § 78c(a)(10). *See also Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385, 391 (6th Cir.1989), *cert. denied sub nom. Trager, Glass & Co.*, —— U.S. ——, 110 S.Ct. 2169, 109 L.Ed.2d 499 (1990).

This definition of "security" is quite broad and includes "most instruments bearing ... a traditional title" of stock and possessing the significant characteristics usually associated with stock. *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686, 105 S.Ct. 2297, 2302, 85 L.Ed.2d 692 (1985). One factor relevant to the application of this definition is expectations—*i.e.*, whether the party holding the interest believes that the securities laws apply. *Id.* at 687, 105 S.Ct. at 2302.

Here, the record establishes not only that plaintiffs' interests are within the Securities Acts' definition of security, but also that both plaintiffs and defendants expected the federal securities laws to apply. The Prospectus prominently and repeatedly refers to ESOP participants' interests as shares of common stock and as securities. The Prospectus also indicates that participants' interests have traditional characteristics of securities—*e.g.*, an assigned par value, the future possibility of dividend payments, the capacity to appreciate, and voting rights. Furthermore, the Prospec-

---

**21.** Moreover, even if plaintiffs hadn't satisfied those pleading requirements, that pleading defect would not warrant dismissal of plaintiffs' complaint. Instead, the appropriate course would be to allow plaintiffs an opportunity to amend their complaint to satisfy Rule 9(b). *See Michaels*, 848 F.2d at 680.

tus states that "[t]he Company and the [ESOP] will also be required to comply with all applicable provisions of the Securities Exchange Act of 1934 ..." thus plainly creating expectations in participants that their interests were securities. Smith's and the ESOP furthered those expectations by filing a Registration Statement and a Proxy Statement with the Securities Exchange Commission and by soliciting participants' votes on ESOP matters by proxy.

Moreover, contrary to its position in this case, Smith's has treated the ESOP participants' interests as securities in another proceeding. Smith's filed a dissenting shareholders action against some members of the putative class here in a Virginia state court action. Therefore, the Court concludes that the interests plaintiffs acquired through the ESOP fall within the scope of the statutory definition of securities. *Sulkow v. Crosstown Apparel Inc.*, 807 F.2d 33 (2d Cir.1986); *Harris v. Republic Airlines, Inc.*, [1988 Transfer Binder] Fed.Sec.L.Rep. (CCH) P 93,772, 1988 WL 56256 (D.D.C.1988).[22]

■ Despite the fact that plaintiffs' interests easily fall within the statutory definition of securities, defendants contend that the fact that plaintiffs acquired their shares of Smith's stock through an ESOP somehow removes those interests from the scope of the Securities Acts. Relying upon *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979), defendants contend that plaintiffs cannot state a claim under the Securities Acts because Smith's ESOP was a voluntary, *non* contributory employee benefit plan. In *Daniel, supra* at 569–70, 99 S.Ct. at 802, the Supreme Court held that "the Securities Acts do not apply to a noncontributory, compulsory pension plan." Defendants' reliance upon *Daniel,* how-

ever, is misplaced because that case is easily distinguishable from the case here.

*First, Daniel* involved a *pension* plan which was automatically part of the compensation package received upon employment. By contrast, the plan here is an *employee stock option* plan which does not have the primary indicia of a pension plan —*i.e.,* the payment of benefits only upon retirement.

*Second,* participation in the *Daniel* pension plan was compulsory and the employees had no choice concerning their participation. By contrast, participation in Smith's ESOP was voluntary. Plaintiffs here had a choice whether to participate in Smith's ESOP and, thus, had an opportunity to reach their own decisions about whether to make an investment in Smith's through the ESOP.

*Third,* the pension plan in *Daniel* was noncontributory—*i.e.,* the participants made no direct payment to the plan.[23] By contrast, Smith's ESOP was contributory. If Smith's employees chose to participate in the ESOP, they gave up part of their compensation package—a specific percentage of their wages—in exchange for the shares acquired through the ESOP.

Despite the fact that plaintiffs gave up an identifiable percentage of their wages, defendants contend that Smith's ESOP is noncontributory for two reasons: (1) participants made no direct payment to the ESOP for the purchase of stock and (2) the wage reduction was not consideration for a sale of securities but was merely a method of deferring income. The Court simply cannot agree that Smith's ESOP was noncontributory. The participants in Smith's ESOP made a direct payment in the form of a payroll deduction for the purchase of their shares of Smith's common stock. Neither plaintiffs nor Smith's intended those deductions to be a mere deferral of

---

22. The Court acknowledges that the ESOP restricted plaintiffs' ability to negotiate and pledge the shares allocated to them under the ESOP, but concludes that those restrictions are not sufficient to negate the character of plaintiffs' interests as securities. *Sulkow,* 807 F.2d at 37.

23. The SEC has defined a "contributory" plan as one "in which employees make direct payments, usually in the form of cash or payroll deductions to the plan." The SEC determined that only voluntary, contributory plans are securities covered by the Securities Acts. *Release No. 33–6188,* Fed.Sec.L.Rep. (CCH) P 1052 (February 1, 1980).

income. *See Foltz v. U.S. News & World Report, Inc.,* 627 F.Supp. 1143, 1161 (D.D. C.1986), *aff'd,* 865 F.2d 364 (D.C.Cir.), *cert. denied,* 490 U.S. 1108, 109 S.Ct. 3162, 104 L.Ed.2d 1024 (1990). In fact, the Prospectus expressly negates any such intention because it states that the wage reductions were intended for only one purpose—the purchase of Smith's stock by ESOP participants, who would be beneficial owners of the stock and whose interests would be aligned with other shareholders of Smith's. *See Dubin v. E.F. Hutton Group, Inc.,* 695 F.Supp. 138, 145 (S.D.N.Y.1988).

*Fourth,* the issue in *Daniel* was whether the pension plan fit the definition of "investment contract" in the Securities Acts. Resolution of that issue required application of the "economic realities" test of *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).[24] The sole purpose of the *Howey* test is "to determine whether a particular instrument is an 'investment contract,' and not whether it fits within any of the examples listed in the statutory definition of 'security.'" *Landreth,* 471 U.S. at 691, 105 S.Ct. at 2304. That test should be used "only when the interest in question does 'not fit squarely within one of the enumerated kinds of securities listed in the [Act's] definition' of a security." *Sulkow,* 807 F.2d at 37 (quoting *Landreth,* 105 S.Ct. at 2304 n. 4). Otherwise, the enumeration of stock and other types of instruments in the statutory definition of securities would be superfluous. *Landreth,* 471 U.S. at 692, 105 S.Ct. at 2305.

Participants in Smith's ESOP acquired shares of common stock. Stock is one of the kinds of securities specifically enumerated in the statutory definition. Unlike the

*Daniel* plaintiffs, plaintiffs here make no claim concerning any interest in an investment contract, and the *Howey* test simply is not applicable. *Sulkow,* 807 F.2d at 37 (citing *Yoder v. Orthomolecular Nutrition Inst., Inc.,* 751 F.2d 555, 558 (2d Cir. 1985)); *Foltz,* 627 F.Supp. at 1159.

The Court concludes that these distinctions make *Daniel* inapplicable. The Smith's ESOP was simply a device for distributing stock in accordance with plaintiffs' decisions to make those investments. The fact that an ESOP was used "does not convert this case into an analogue to ... *Daniel* and it does not insulate the transaction from the reach of federal securities laws." *Harris v. Republic Airlines, Inc.,* [1988 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,772, at 98,625–26 (D.D.C.1988).[25]

c. *Failure to State any Material Omission*

▬ Defendants contend that the Prospectus "negates" plaintiffs' allegations of securities fraud because: (1) the allegedly false statements in the Prospectus and Proxy are not statements of fact and (2) Smith's obligation to repay the push-down debt—the only omission upon which defendants claim plaintiffs rely—was revealed in the Prospectus.

Contrary to defendants' contentions, the alleged misrepresentations upon which plaintiffs base their securities fraud claims are statements of fact, rather than of expectation. Specifically, plaintiffs claim that Smith's misrepresented the use planned for ESOP funds and the fair market value of plaintiffs' shares at the time of the proposed sale to American Carriers.

---

**24.** The *Howey* test required a court to look at the economic realities of a transaction to determine whether it "involve[d] an investment of money in a common enterprise with profits to come solely from the efforts of others." *Howey,* 328 U.S. at 301, 66 S.Ct. at 1104.

**25.** For similar reasons, this Court declines to follow *Bauman v. Bish,* 571 F.Supp. 1054 (N.D. W.Va.1983), which held that an ESOP created in connection with an employee buyout of a corporation was not within the scope of the Securities Acts. The *Bauman* court concluded that the

ESOP was not voluntary because the employees had no choice about whether to participate; instead, stock was to be automatically allocated to every employee who met minimum service requirements. *Id.* at 1064. The *Bauman* court also concluded that the ESOP was noncontributory and simply "a method of deferring income, not reducing wages or paying for stock" because participants gave up no tangible, definable specific value in exchange for the stock. *Id.* By contrast, this Court has concluded that Smith's ESOP is voluntary and contributory.

Moreover, plaintiffs' claims of securities fraud obviously involve more than omission of Smith's obligation to repay the push-down debt. Plaintiffs admit that they were informed of the existence of that debt, but allege that defendants misrepresented the use of the ESOP proceeds. They claim that defendants represented that the proceeds would be used for the purchase of new equipment and other capital expenditures, rather than for repayment of the push-down debt for which the funds allegedly were used.

Therefore, the Court disagrees with defendants' interpretations of the Prospectus and plaintiffs' allegations of misrepresentations, and concludes that plaintiffs' allegations are sufficient to overcome defendants' claim that the Prospectus negates their securities fraud claims.

#### d. *Statute of Limitations*

 Defendants contend that plaintiffs failed to file their claims under sections 77k and 77 *l* of the Securities Act of 1933 ("1933 Act") within the applicable statute of limitations because they did not file their complaint within one year after dissemination of the Prospectus.

Section 13 of the 1933 Act provides, in relevant part, that:

[n]o action shall be maintained to enforce any liability created under section 77k or 77 *l* (2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77 *l* (1) of this title, unless brought within one year after the violation.

15 U.S.C. § 77m.

According to this statute, plaintiffs must have filed their securities fraud action within one year of the alleged fraud or within one year of the date upon which they discovered, or with reasonable diligence should have discovered, the alleged fraud. *See, e.g., Herm v. Stafford,* 663 F.2d 669, 682 (6th Cir.1981). Thus, section 13 incorporates an equitable tolling doc-

trine by expressly providing for a discovery of the fraud rule. Plaintiffs have the burden of pleading "circumstances which would indicate why the alleged fraud was not discovered earlier and which would indicate why the statute should be tolled." *Auslender v. Energy Management Corp.,* 832 F.2d 354, 356 (6th Cir.1987).

The Prospectus and promotional materials relating to Smith's ESOP were disseminated to Smith's employees on November 25, 1985. Plaintiffs did not file their original complaint until August 27, 1987, which was over one year and nine months after that dissemination. Defendants claim that plaintiffs' complaint does not state any facts explaining why they could not discover the alleged fraud within one year of the dissemination of the Prospectus or whether they exercised reasonable diligence to discover the fraud. The Court concludes that plaintiffs' complaint states sufficient facts which, if proven, would establish that defendants concealed the alleged fraudulent acts from plaintiffs until at least July 7, 1987, when Smith's sent written notice to plaintiffs of its proposed merger with American Carriers.

Plaintiffs' complaint concerns events occurring after dissemination of the Prospectus which allegedly rendered statements in that document fraudulent and misleading. Specifically, although the Prospectus states that ESOP proceeds would be used for equipment purchases and other capital investments, plaintiffs allegedly later discovered that ESOP proceeds were used to repay the push-down debt. Plaintiffs had no way of knowing that the stated use for ESOP funds would not be carried out until the ESOP had been in existence for some time.

Similarly, although the Prospectus states that participants would receive an independently appraised fair market value for their shares, plaintiffs allegedly later discovered that they were not being offered a fair market value. Moreover, plaintiffs claim that negotiations for the merger of Smith's and American Carriers—the genesis for the valuation upon which their securities fraud claims are partially based—were kept se-

cret and not revealed to them until July of 1987.

Obviously, plaintiffs could have no suspicions about the fair market value of their shares announced in connection with American Carrier's merger with Smith's until that value and the merger were announced in July of 1987. This is especially true in light of the fact that Smith's announced that the value of plaintiffs' shares had increased in the fall of 1986 and again in the spring of 1987. The presence of a fiduciary relationship between plaintiffs and defendants Smith's, Sovran, and the ESOP indicates that plaintiffs' reliance upon those defendants' earlier representations about the fair market value of their shares was justified. *Campbell v. Upjohn Co.,* 498 F.Supp. 722, 729 (W.D.Mich.1980), *aff'd,* 676 F.2d 1122 (6th Cir.1982). Thus, until the summer of 1987, plaintiffs had no cause to suspect fraud with respect to the valuation of their stock.

The Court concludes that these allegations by plaintiffs are sufficient to establish fraudulent concealment and, thus, to toll the running of the statute of limitations until their discovery of the alleged fraud in July of 1987. *Renovitch v. Stewardship Concepts, Inc.,* 654 F.Supp. 353, 358 (N.D.Ill.1987). *See also Stone v. Fossil Oil & Gas,* 657 F.Supp. 1449, 1457–58 (D.N.M.1987). Accordingly, the Court holds that plaintiffs' 1933 Securities Acts claims, which were brought in August of 1987—one month after discovery of the alleged fraud—are not time barred by the limitations period of section 13 of the 1933 Act.

2. The ERISA Claims

Defendants contend that plaintiffs have failed to state a claim under ERISA for several reasons: (1) the allegations of ERISA violations are not sufficient to satisfy Rule 8(a)(2) of the Federal Rule of Civil Procedure; (2) defendants have a "built-in"

defense to any claims that they violated their fiduciary duties by acquiring Smith's shares for ESOP participants; (3) plaintiffs cannot show that defendants did not act prudently in determining the value of plaintiffs' shares; and (4) ERISA provides no liability for termination of the ESOP. The Court disagrees with these contentions and, therefore, denies defendants' motion to dismiss plaintiffs' ERISA claims.

a. *Rule 8(a)(2)*

■ Defendants contend that plaintiffs have not satisfied the pleading requirements of Rule 8(a)(2) because their ERISA allegations simply repeat the relevant ERISA sections and contain nothing to relate defendants' acts to any failure to disclose. After a careful review of the ERISA counts in plaintiffs' amended complaint, the Court concludes that those counts set forth more than what defendants contend.

Plaintiffs have alleged that the fiduciaries of Smith's ESOP violated ERISA sections 404 and 406, 29 U.S.C. §§ 1104 and 1106, by failing to act solely in the interest of the plan participants and engaging in a prohibited transaction. In addition, plaintiffs suggest that the fiduciaries violated the requirements of ERISA section 407, 29 U.S.C. § 1107, by making investments solely in Smith's stock on behalf of plan participants. The specific acts underlying these general allegations are, *inter alia,* that (1) the fiduciaries misused ESOP proceeds and (2) acquired participants' stock at an inflated value and sold those stock at less than the fair market value.[26]

The Court concludes that these allegations are sufficient to provide defendants fair notice of plaintiffs' ERISA claims and the grounds upon which those claims rest, which is all that Rule 8(a)(2) requires. *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir.1976).[27]

---

**26.** For the purposes of this motion, the Court must treat these factual allegations of wrongdoing on the part of ESOP fiduciaries as true. *Warren v. Society Nat'l Bank,* 905 F.2d 975, 976 (6th Cir.1990).

**27.** Moreover, even if the Court concluded that plaintiffs' ERISA allegations failed to satisfy Rule 8(a)(2), the appropriate course would not be to dismiss the complaint but would be to allow plaintiffs an opportunity to amend. *See supra* at 1289 n. 21.

**1294**

### b. *"Built–In" Defense*

 Defendants contend that they have a built-in defense to the claims for violations of ERISA sections 404 and 406 in Count 2 of plaintiffs' amended complaint. Defendants characterize Count 2 as seeking damages only for the fiduciaries' decision to invest primarily in Smith's stock on behalf of ESOP participants.[28] They claim that because ERISA and Smith's ESOP plan documents authorize and require the ESOP to "primarily invest in" Smith's employer securities, the ESOP fiduciaries acted in accordance with the statutes and plan documents and, thus, could not have violated ERISA.

ERISA Section 404(a)(1)(C) provides that plan fiduciaries must diversify the investments of the plan "so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent" to not diversify. 29 U.S.C. § 1104(a)(1)(C). However, section 404(a)(2) provides that the diversification requirement is not violated when an "eligible individual account plan" acquires or holds "qualifying employer securities." 29 U.S.C. § 1104(a)(2). An "eligible individual employer account" includes an employee stock ownership plan. 29 U.S.C. § 1107(d)(3)(A). A "qualifying employer security" includes stock. 29 U.S.C. § 1107(d)(6). Like section 404(a)(2), section 408(e) provides that the acquisition of qualifying employer securities is exempt from the section 406 and 407 prohibitions against certain transactions, as long as specified conditions are met. 29 U.S.C. §§ 1108(e) & 1106.

Smith's employee stock option plan is an eligible individual account plan which has acquired qualifying employer securities— *i.e.*, shares of Smith's stock. The Smith's employee benefit plan at issue here appears to qualify for exemption from the section 404(a)(1)(C) diversification requirement and the section 406 prohibitions against certain transactions. Nevertheless, the Court

must reject defendants' argument because it not only oversimplifies Count 2, but it also relies upon an overbroad and incomplete interpretation of the relevant ERISA sections.

*First,* in Count 2, plaintiffs do not claim that the investment in Smith's stock, in and of itself, violated ERISA. To the contrary, plaintiffs claim that when investing in Smith's shares, the fiduciaries breached their fiduciary duties by paying consideration in excess of the fair market value for the shares. The ERISA sections upon which defendants rely for their built-in defense argument *do not* sanction the acquisition of an employer's stock for consideration exceeding the fair market value.

Indeed, one of the express conditions in section 408(e) is that the acquisition of employer securities be for adequate consideration. 29 U.S.C. § 1108(e)(1).[29] Section 3(18) defines adequate consideration as "the fair market value for the asset *as determined in good faith* by the trustee or named fiduciary pursuant to the terms of the plan or in accordance with regulations promulgated by the Secretary [of Labor]." 29 U.S.C. § 1002(18) (emphasis added). Here, the essence of Count 2 centers on the question of adequate consideration—*i.e.,* whether the fiduciaries determined the fair market value of Smith's stock in good faith or paid more than fair market value for plaintiffs' shares.

*Second,* although Smith's ESOP may be exempt from some of ERISA's fiduciary provisions, it is not exempt from the general fiduciary duties of section 404. Those duties include acting for the exclusive purpose of the providing benefits to participants and with the care, skill, prudence, and diligence of a prudent man under similar circumstances. *See* 29 U.S.C. § 1104(a)(1)(A) & (C). *See also Fink v. National Sav. & Trust Co.,* 772 F.2d 951, 955 (D.C.Cir.1985). This Court concludes

---

**28.** The record contains no indication that the ESOP invested in anything other than Smith's stock.

**29.** Even though adequate consideration is not expressly mentioned in the section 404(a)(2) di-

versification exemption, the Court concludes that the question of adequate consideration is also a relevant inquiry for plaintiffs' claim for breach of section 404. *See Donovan v. Cunningham,* 716 F.2d 1455, 1465 (5th Cir.1983).

that those duties encompass a duty to acquire shares on behalf of ESOP participants for an adequate consideration. Furthermore, at this early stage of litigation, two central questions in connection with those duties remain unresolved—*i.e.,* whether a prudent investigation was undertaken with respect to the stock's valuation and, if so, whether such an investigation would have revealed that the fiduciaries paid more than the fair market value for the stock. *See Brumfield v. Shelton,* 727 F.Supp. 282, 284 (E.D.La.1989).

Therefore, the Court concludes that defendants have no "built-in" defense requiring the dismissal of Count 2 for failure to state a claim under ERISA. In addition, the Court concludes that, at this stage of the litigation, the claim stated in Count 2 implicates unresolved factual questions.

#### c. *Defendants' Prudence in Valuation of Shares*

■ Defendants contend that Count 3 does not state a claim under ERISA for breach of fiduciary duty because it states only a "naked claim of disappointment" in the price ESOP participants would receive for their shares when ARA sold Smith's to American Carriers. Defendants are correct that the focus of the prudent man standard "is how the fiduciary acted in his selection of the investment, and not whether his investments succeeded or failed." *Donovan,* 716 F.2d at 1467. That general statement alone, however, does not resolve whether the defendants here satisfied their fiduciary duty with respect to the sale of plaintiffs' investment in Smith's shares under the ESOP. As discussed in the previous section, plaintiffs do not challenge the investment in Smith's stock, but the price at which their stock was purchased and resold.

Furthermore, the Court simply cannot conclude that ERISA would allow plan fiduciaries to sell plan investments with completely unfettered discretion. *Cf.* 29 U.S.C. § 1108(e) (Adequate consideration is required in the acquisition of investments.). To the contrary, the determination of the adequacy of the price plaintiffs received

directly depends upon the *conduct* of the fiduciaries—*i.e.,* whether they acted in good faith—and, thus, negates any proposition that such unfettered discretion exists. *Donovan,* 716 F.2d at 1467.

Therefore, the Court concludes that Count 3 states a claim under ERISA because the fiduciaries' decision to invest in Smith's stock, including any determination of value, is "subject to closest scrutiny under the prudent person rule, in spite of 'strong policy and preference in favor of investment in employer stock.' " *Fink,* 772 F.2d at 955.

#### d. *Termination of the ESOP*

■ Defendants contend that the essence of all plaintiffs' ERISA claims are complaints about the creation and termination of Smith's ESOP. They argue that all of plaintiffs' ERISA counts should be dismissed for failure to state a claim because (1) ERISA neither requires the creation nor prohibits the termination of an ESOP and (2) decisions relating solely to such actions are outside the reach of ERISA.

Defendants again not only oversimplify plaintiffs' claims, but also rely upon an in incomplete interpretation of the duties and obligations ERISA imposes upon plan fiduciaries. Plaintiffs' claims relate to more than the simple fact of ESOP termination. In fact, their claims do not attack the fact that Smith's terminated its ESOP, but challenge acts leading up to the termination including the secret negotiation and sale of their shares of Smith's stock for an inadequate price. The Court concludes that these alleged actions taken in connection with the ESOP's termination clearly are subject to review under ERISA's fiduciary duty standards. *United Steelworkers of Am., Local 2116 v. Cyclops Corp.,* 860 F.2d 189, 198 (6th Cir.1988).

### 3. The RICO Claims

■ Defendants contend that plaintiffs have failed to state a claim under RICO for two reasons: (1) plaintiffs have not satisfied the pleading requirement of Rule 9(b) of the Federal Rules of Civil Procedure and

(2) plaintiffs have not adequately alleged a pattern of racketeering activity. The Court has already addressed and rejected defendants' argument for dismissal based upon Rule 9(b), *see supra* at 1288–89, and will not address that argument again here. The Court agrees with defendants' contention that plaintiffs have failed to allege a pattern of racketeering activity. Moreover, the Court concludes that there is no unresolved genuine issue of material fact indicating that plaintiffs can allege such a pattern and, therefore, grants summary judgment for defendants on plaintiffs' RICO claim.

Count 7 of plaintiffs' amended complaint alleges a violation of RICO section 1962(c). A violation of that section consists of "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (footnote omitted). *See also* 18 U.S.C. § 1962(c). Section 1961(1) defines racketeering activity as (1) various serious felonies chargeable under state law—*e.g.*, murder, robbery; (2) certain acts indictable under Title 18 of the United States Code—*e.g.*, mail and wire fraud, extortion; (3) violations of NLRA section 186; and (4) federal securities and narcotics violations. 18 U.S.C. § 1961(1). Section 1961(5) states that at a minimum, the existence of a "pattern of racketeering activity" requires proof of "at least two acts of racketeering activity" within a designated time frame. 18 U.S.C. § 1961(5).[30]

Plaintiffs' amended complaint states the following alleged predicate racketeering activity: (1) violations of the federal securities laws and (2) violations of Title 18 of the

United States Code, specifically mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1843), obstruction of justice (18 U.S.C. § 1503), and the Hobbs Act (18 U.S.C. § 1951). The Court is inclined to agree with defendants that plaintiffs may not have sufficiently detailed the manner in which defendants committed at least some of these various predicate offenses.[31] On the other hand, the Court believes that plaintiffs have sufficiently pleaded some of the predicate acts upon which they rely— *e.g.*, federal securities laws violations, mail fraud, and wire fraud. The Court concludes, however, that assuming plaintiffs have sufficiently pleaded two acts of racketeering activity, they nevertheless have failed to state a claim under RICO because those predicate acts do not constitute a pattern of racketeering activity.

Plaintiffs must prove more than two predicate acts of racketeering activity to establish the requisite element of a pattern of such activity.

> ... Congress had a more natural and commonsense approach to RICO's pattern element in mind, intending a more stringent requirement than proof simply of two predicates, but also envisioning a concept of sufficient breadth that it might encompass multiple predicates within a single scheme that were related and that amounted to, or threatened the likelihood of, continued criminal activity.

*H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989). To establish a claim under RICO, plaintiffs must prove the "racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at 239,

---

**30.** The Supreme Court has explained that section 1961(5) does not so much define "pattern of racketeering activity" as "state a minimum necessary for the existence of such a pattern." *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14.).

**31.** For example, plaintiffs state only that certain conduct by Smith's and ARA "was undertaken for the purpose of securing the Plaintiffs' property through the use of fear and intimidation and was therefore extortionate" and in violation

of 18 U.S.C. § 1951. Plaintiffs' Amended Complaint Count 7, paragraph 81d. Nowhere in Count 7 have plaintiffs explained the fear and intimidation to which they are referring. Similarly, plaintiffs vaguely allege that certain Smith's employees used fear and intimidation to preclude plaintiff Gerald Risinger, another Smith's employee, from participating in this action and deprive him of "valuable property rights" in violation of 18 U.S.C. §§ 1951 and 1503. Again, nowhere in Count 7 have plaintiffs explained the fear and intimidation, or the property right, to which they are referring.

109 S.Ct. at 2900 (emphasis in original). In other words, plaintiffs must prove continuity plus relationship.

With respect to the relationship between the various predicate acts, plaintiffs must establish that the alleged criminal acts are not isolated events but have the same or similar purposes, results, methods, participants, or victims. *Id.* at 240–41, 109 S.Ct. at 2901 (quoting 18 U.S.C. § 3575(e)). Here, the racketeering predicates for plaintiffs' RICO claims arise from a series of events involving the allegedly fraudulent operation of Smith's ESOP. Since those predicates involve the same participants and victims, as well as the same purposes and results, the Court concludes that they are related.[32]

With respect to the element of continuity, plaintiffs must establish that the predicate acts or offenses are, or pose the threat of being, continuous. *Id.* at 241–43, 109 S.Ct. at 2902. Continuity refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.*

A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: *Congress was concerned in RICO with long-term criminal conduct.* Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

*Id.* (emphasis in original and added). RICO, therefore, is concerned only with prolonged criminal endeavors. *Menasco,*

*Inc. v. Wasserman,* 886 F.2d 681, 684 (4th Cir.1989).

The predicate acts alleged by plaintiffs here covered a time span of approximately two years, beginning with the dissemination of the Prospectus and other promotional materials in September 1985 and ending with the proposed sale of Smith's to ARA and termination of the ESOP in 1987. After that sale and the ESOP's termination, the vehicle for the alleged fraudulent scheme—*i.e.,* the ESOP—would no longer exist. This fact leads the Court to one inevitable conclusion: The predicate acts alleged simply do not indicate that there is any threat of long-term racketeering activity by defendants continuing beyond the ESOP's termination. *Compare United States v. Busacca,* 739 F.Supp. 370, 377 (N.D.Ohio 1990) (A series of embezzlements capable of indefinite repetition is sufficient to establish a pattern.).

Moreover, the Court concludes that the narrow, short-lived fraud allegedly perpetrated by defendants does not involve the type of continuing racketeering activity which Congress intended RICO to encompass. *See Menasco,* 886 F.2d at 683. *See also Sutherland v. O'Malley,* 882 F.2d 1196, 1204–05 (7th Cir.1989); *Pyramid Sec. Ltd. v. International Bank,* 726 F.Supp. 1377, 1384 (D.D.C.1989), *aff'd sub nom. Pyramid Sec. Ltd. v. IB Resolution, Inc.,* 924 F.2d 1114 (D.C.Cir.1991).

Therefore, the Court concludes that plaintiffs have not, and can not, identify any genuine issue of material fact concerning the pattern element of their RICO claim in Count 7 of their amended complaint. Accordingly, the Court grants summary judgment in favor of defendants with respect to plaintiffs' RICO claim.

### CONCLUSION

For the foregoing reasons, the Court denies defendants' Rule 12(b)(1) motion to

---

**32.** Defendants contend that the alleged predicate acts are not related because they occurred in different time periods and some of those acts related to events occurring after this suit was filed. The Court concludes that the difference in time periods is immaterial for several reasons. First, the predicate acts concern one alleged scheme to defraud participants in Smith's

ESOP which encompasses activities occurring before the implementation of the ESOP, during its existence, and upon its termination. Second, RICO is concerned with continued criminal conduct, which in many instances would extend beyond the filing of a complaint alleging a RICO violation.

dismiss for lack of subject matter jurisdiction over plaintiffs' claims under the Securities Acts, ERISA, and RICO. With respect to defendants' Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted, the Court denies that motion to the extent it seeks dismissal of plaintiffs' claims under the Securities Acts and ERISA. The Court grants that motion to the extent it seeks dismissal of plaintiffs' claims under RICO and, furthermore, grants summary judgment in favor of defendants on that claim.

An appropriate order has been entered this 25th day of April, 1991.

### ORDER

For the reasons explained in the memorandum filed this date,

IT IS HEREBY ORDERED that the motion of defendants to dismiss plaintiffs' complaint for lack of subject matter jurisdiction is denied.

IT IS FURTHER ORDERED that the motion of defendants to dismiss plaintiffs' claims under (1) sections 404 and 406(a) of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1104 & 1106(a), (2) sections 77k and 77 *l* of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77 *l*, and (3) Rules 10b–5 and 14a–9, 17 C.F.R. §§ 240.-10(b)(5) & (a)(9), enacted pursuant to the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78kk, for failure to state a claim is denied.

IT IS FURTHER ORDERED that, pursuant to Fed.R.Civ.P. 12(b) and 56, summary judgment is granted in favor of defendants on plaintiffs' claim under section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), and that claim therefore is dismissed.

IT IS SO ORDERED this day of April 25, 1991.

This is not a final order.